UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAUL BARAJAS, et al.,

        Plaintiffs,

   v.

CITY OF ROHNERT PARK, et al.,

        Defendants.

Case No.  14-cv-05157-MEJ

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 26, 33

## INTRODUCTION

This case considers the Fourth Amendment privacy rights of co-inhabitants of probationers.  Pending before the Court are the parties' cross motions for summary judgment. Defs.' Mot., Dkt. No. 26; Pls.' Mot., Dkt. No. 33.  Having considered the parties' positions, relevant legal authority, and the record in this case, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion and **DENIES** Plaintiffs' Motion as set forth below.

## BACKGROUND[1]

**A.**  **Factual Background**

Plaintiffs Elva Barajas and Raul Barajas ("Plaintiffs") are the mother and step-father of Edgar Horacio Perez.  Defs.' Summ. of Undisputed Facts ("Defs.' SUF") ¶ 1, Dkt. No. 40.[2] Plaintiffs lived with Perez, their adult daughter, and another son in Rohnert Park, California in November 2014.  *Id.* ¶ 3.  At that time, Perez was on three separate grants of probation, and each

---

[1] The following facts are undisputed unless otherwise noted.

[2] This document contains Defendants' original Statement Undisputed Facts (Dkt. No. 28) and Plaintiffs' responses.  Defendants are the City of Rohnert Park, and Rohnert Park Police Officers Jacy Tatum, David Rodriquez, and Matthew Snodgrass.

United States District Court
Northern District of California

probation grant had the following search condition: "Submit to warrantless search/seizure of residence any time day or reasonable hr. night by any Prob/Law Enforc. Off." Pls.' Summ. of Undisputed Facts ("Pls.' SUF") ¶ 10, Dkt. No. 54[3]; Defs.' SUF ¶ 4. Perez was on probation for pleas relating to resisting arrest (PC 148(a)(1)), simple possession (HS 11550(a)), and possession of controlled substance (HS 11377(a)). Justice Decl., Ex. A, PDF Page Nos. 10, 19, 25, Dkt. No. 30; *see also* Defs.' SUF ¶ 2.

On November 4, 2014, at 4:52 p.m, three officers of the Rohnert Park Police Department, Defendants Jacy Tatum, David Rodriguez, and Matthew Snodgrass, went to Plaintiffs' home to conduct a suspicionless search of Perez's residence pursuant to his probation search conditions. Defs.' SUF ¶¶ 4, 6; Pls.' SUF ¶¶ 7, 9. There was no urgency or exigent circumstances to do the search on that day. Pls.' SUF ¶ 12.

Two officers, Rodriguez and Snodgrass, went to the front door and knocked, and Plaintiffs answered the door. Pls.' SUF ¶ 20; Defs.' SUF ¶ 7. Mr. Barajas testified he asked the officers to see "a letter that said that they could enter," and an officer responded "they could come in whenever they wanted" because Perez was on probation. Lewis Decl., Ex. B (R. Barajas Dep.) 33:25-34:6, Dkt. No. 32-1. Officer Rodriquez testified he told Plaintiffs his name and that he was there to do a probation search, and "[Perez]'s father said, 'I want to see your search warrant.'" *Id.*, Ex. D (Rodriquez Dep.) 44:3-8, 44:25-45-2, Dkt. No. 32-3. Officer Rodriquez testified that he explained to Mr. Barajas that did not have a search warrant, but Perez was on probation and he therefore did not need one. *Id.* 44:8-10. According to Officer Rodriquez, Mr. Barajas kept saying, "I want to read your search warrant, I want to see your paper." *Id.* 44:12-17. Officer Snodgrass did not speak with Mr. Barajas when he answered the door but confirmed that Officer Rodriquez informed Mr. Barajas they were there to do a probation search and that there was a dialogue about a search warrant. Lewis Decl., Ex. E (Snodgrass Dep.) 34:21-35:8, Dkt. No. 32-3. Mr. Barajas also testified he told the officers Perez was not home. R. Barajas Dep. 34:7-11.

During this conversation, Officer Tatum went through the side gate and entered the Barajas

---

[3] This document contains Plaintiffs' original Statement Undisputed Facts (Dkt. No. 35), and Defendants' responses.

2

home through a rear sliding door.  Pls.' SUF ¶ 21; Defs.' SUF ¶ 9.  He entered the Barajas' home with his gun drawn while the two other officers were still outside the front door, speaking with the family.   Pls.' SUF ¶ 23.  Officer Tatum testified he could hear officers Snodgrass and Rodriquez talking as he entered, and according to Officer Tatum, he announced "Police Department, probation search[.]"  Lewis Decl., Ex. A (Tatum Dep.) 55:25-56:1, Dkt. No. 32-1.  He testified he cleared the room for any people and then went into a dining area and the kitchen, making his way towards the front where he could hear talking.  *Id.* 58:2-9.  He also testified he could not see the other officers from the sliding door and described the voices as "[m]uffled.  I could just hear voices talking."  *Id.* 58:10-16.  Plaintiffs' daughter, Lorena Barajas, was present during the search and explained that while her father was speaking with the officers in the front, "very shortly (within 30 seconds) of my father opening the door, a third officer . . . came inside and was standing inside our home, behind us and essentially surrounding my father, my mother, and me." L. Barajas Decl. ¶ 3, Dkt. No. 36.  She stated he "did not knock and did not announce that he was entering[,]" and she was "surprised and startled to see him standing behind us, inside our home.  It was very intimidating."  *Id.*

Lorena further explained that "[b]ecause the officer was already inside, I told my father to let the other two officers in."  *Id.*  Mr. Barajas testified the officers in the front "waited for the other one to come in" and once they "saw that he was inside . . . they put on their gloves and they went inside."  R. Barajas Dep. 34:19-21, 36:9-16.  Officer Snodgrass testified he saw officer Tatum inside "[a]t some point just prior to making entry" into Plaintiffs' home.  Snodgrass Dep. 35:21-25; 37:1-7.  Officer Rodriquez testified that Perez's sister told her father "something to the effect of . . . They don't need a paper, just let them in," but also testified this was after Officer Tatum had already entered the home.  Rodriquez Dep. 52:10-22.  According to Defendants, Officers Rodriquez and Snodgrass "entered the home and searched the premises for Perez over the objection of Plaintiffs."  Defs.' SUF ¶ 10.

The officers then searched the bedrooms, closets, and the bathroom for Perez and did not find him.  Tatum Dep. 75:20-21; Rodriquez Dep. 53:9-12; Defs.' SUF ¶ 11; Pls.' SUF ¶ 49. Officer Rodriquez testified he asked Perez's father and sister many times where he was and where

his room was, but they never answered directly. Rodriquez Dep. 53:13-25. The entire incident, from arrival of the officers to their departure after the search, lasted 18 minutes. Defs.' SUF ¶ 6. No one was injured or assaulted or arrested. *Id.* ¶ 11.

Afterwards, the Barajas family went to the Rohnert Park Police Station to complain about the November 4, 2014, search of their home. Pls.' SUF ¶ 39. A sergeant told Officer Snodgrass the family had come to the police department to complain about the search of their home; Officer Snodgrass told the sergeant they did a probation search, and the sergeant did not ask him anything further about what had happened. Pls.' SUF ¶ 40. Officers Tatum and Snodgrass have not been given any guidance on what they might have done differently with respect to the search of the Barajas' home, and Officer Rodriguez has not been told he did anything incorrectly with respect to the search. *Id.* ¶¶ 41-42. Additionally, Officers Tatum and Snodgrass have not been told they violated policy or protocol in connection with their search. *Id.* ¶ 43.

After speaking with two Commanders at the Rohnert Park Police Department about the way he entered the Barajas home, Officer Tatum concluded they had no issue with the way he entered the home. *Id.* ¶ 46. Officer Snodgrass testified he did not report anything to his supervisors about officer Tatum's entry because having an officer enter through the back before officers enter through the front is the Rohnert Police Department's "practice. That's happened before." *Id.* ¶ 28. Officer Tatum has entered through a rear door during probation searches 50-60 times before other officers have entered through the front door and testified this was consistent with his training. *Id.* ¶¶ 25-27. Sergeant Jeff Justice was designated as the 30(b)(6) witness for the City of Rohnert Park to testify regarding training and practices pertaining to probation searches and testified that he has trained officers in the city of Rohnert Park to conduct probation searches in this manner. *Id.* ¶¶ 30, 34. No additional training has been offered and nothing has changed (since the search of the Barajas' home) with respect to how the Rohnert Park Police Department conducts probation searches. *Id.* ¶ 45.

**B.     Procedural Background**

Plaintiffs filed this action on November 21, 2014. Compl., Dkt. No. 1. In their Second Amended Complaint, they allege six causes of action: (1) violation of Plaintiffs' Fourth

1   Amendment Rights pursuant to 42 U.S.C. § 1983; (2) violation of Section 13 of Article I of the

2   California Constitution for unreasonable search and seizure; (3) negligence; (4) assault; (5)

3   invasion of privacy under Section 1 of Article I of the California Constitution; and (6) declaratory

4   and injunctive relief.   Second Am. Compl., Dkt. No. 16.

5      Plaintiffs and Defendants have filed cross motions for summary judgment.  The Court held

6   a hearing on the matters on October 15, 2015.  Dkt. No. 57.  Having carefully considered the

7   evidence and briefing in this matter, the Court addresses the parties' arguments below.

8                   **LEGAL STANDARD**

9      Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

10   that there is "no genuine dispute as to any material fact and [that] the movant is entitled to

11   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment

12   bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that

13   demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

14   317, 323 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v.*

15   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is

16   sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

17      Where the moving party will have the burden of proof on an issue at trial, it must

18   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

19   party.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

20   the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by

21   pointing out to the district court that there is an absence of evidence to support the nonmoving

22   party's case.  *Celotex*, 477 U.S. at 324-25.

23      If the moving party meets its initial burden, the opposing party must then set forth specific

24   facts showing that there is some genuine issue for trial in order to defeat the motion.  Fed. R. Civ.

25   P. 56(e); *Anderson*, 477 U.S. at 250.  All reasonable inferences must be drawn in the light most

26   favorable to the nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir.

27   2004).  However, it is not the task of the Court to scour the record in search of a genuine issue of

28   triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The Court "rel[ies] on the

United States District Court
Northern District of California

United States District Court
Northern District of California

nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323 (internal quotations omitted).

## DISCUSSION

Both parties contend they are entitled to summary judgment. Plaintiffs argue "[t]here is no genuine dispute that the search of the Barajas home was unreasonable and failed to comply with the Fourth Amendment" because (1) the officers did not have reasonable suspicion that Perez was engaged in criminal activity; and (2) Officer Tatum's method of entry, through the sliding back door gun in hand while the other two officers spoke to the Barajas family at the front door, was unreasonable and improper. Pls.' Br. in Supp. of Pls.' Mot. ("Pls.' Br.") at 4, Dkt. No. 34. Defendants agree "Rohnert Park Officers initiated a suspicionless search of Perez's home," but contend his probation condition permitted such suspicionless probation searches, and the state's special needs related to monitoring probationers outweighs any privacy interests of the Plaintiffs; thus they assert the search was reasonable under the Fourth Amendment. Defs.' Br. in Supp. of City's Mot. ("City Br.") at 9, Dkt. No. 27. In turn, Defendants argue the officer Defendants are entitled to qualified immunity and Plaintiffs' state law claims must fail as well. *Id.* at 9, 17. Plaintiffs respond that regardless of the quantum of suspicion required, a reasonable jury could find the search was unreasonable for independent reasons, including that (1) Officer Tatum's uninvited entry through the back gate and back door with his gun drawn, before the other officers had entered, violated the knock and announce rule; (2) the search was harassing; or (3) the search over Plaintiffs' objection was unreasonable under Supreme Court precedent, *Georgia v. Randolph*. Pls.' Opp'n at 10-15, Dkt. No. 39. Plaintiffs argue the officer Defendants are likewise precluded from qualified immunity. *Id.* The dispute thus centers on whether the officers violated Plaintiffs' Fourth Amendment rights, and if so, whether Defendants may be held liable.

1    In considering whether the search in this case was constitutional, the Court is mindful that

2  Fourth Amendment rights "are personal in nature."  *Steagald v. United States*, 451 U.S. 204, 219

3  (1981).  A search that is reasonable as to one individual may be unreasonable as to another.  *Id.*

4  Thus, while the parties tend to focus on the privacy expectations of Plaintiffs' son, Edgar Perez,

5  concentrating on how diminished a *probationer*'s privacy rights are and what terms Perez agreed

6  to in his probation search conditions, the Court is cautious in not conflating Perez's rights with

7  Plaintiffs' rights.  Put another way, it is not Perez's privacy interests that matter here—rather, it is

8  the privacy interests of his co-inhabitants that are of consequence to this case.  *See Perez v.*

9  *Simmons*, 884 F.2d 1136, 1141 (9th Cir. 1988) ("The privacy interest protected by the Fourth

10  Amendment is personal to the individual asserting it."), *amended on other grounds*, 900 F.2d 213

11  (9th Cir. 1990), *order corrected on other grounds*, 998 F.2d 775 (9th Cir. 1993).

12    To assess the parties' motions, the Court finds it helpful to begin with a survey of Fourth

13  Amendment jurisprudence relating to the issues in this case and the legal standards associated with

14  qualified immunity and municipal liability.  The Court then turns to whether Plaintiffs' rights were

15  violated and then whether the Defendant officers are entitled to qualified immunity.  Finally, the

16  Court considers whether Plaintiffs may maintain their municipal liability claims against the City.

### A.    Survey of Fourth Amendment Jurisprudence

18    The United States Constitution protects "the right of the people to be secure in their

19  persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const.

20  amend. IV.  The Fourth Amendment protects reasonable and legitimate expectations of privacy.

21  *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  It protects "people not

22  places."  *Id.* at 351, 361.  A private home is "'where privacy expectations are most heightened.'"

23  *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (quoting *Dow Chem. Co. v. United States*, 476 U.S.

24  227, 237 n.4 (1986)).  Indeed, "'physical entry of the home is the chief evil against which the

25  wording of the Fourth Amendment is directed.'"  *Payton v. New York*, 445 U.S. 573, 585 (1980)

26  (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972)).  It is, therefore, "a basic

27  principle of Fourth Amendment law that searches and seizures inside a home without a warrant are

28  presumptively unreasonable."  *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quotation

7

omitted).  Accordingly, "[a] warrantless entry into a home violates the Fourth Amendment unless an exception to the Fourth Amendment warrant requirement applies, such as emergency, exigency, or consent."  *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 533 (9th Cir. 2010).  Valid consent may be granted by a person with actual or apparent authority to give permission to search.  *See Illinois v. Rodriguez*, 497 U.S. 177, 186-89 (1990).

      1.    <u>Probationer's Consent as an Exception to the Warrant Requirement</u>

"A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable[,]'" *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987), but parolees and probationers often consent to searches of their residences as a condition of their parole or probation.  In light of such consent, in certain instances the Supreme Court has found suspicionless searches or searches conducted on only reasonable suspicion to be reasonable under the Fourth Amendment.  *See id.* at 872-73 (based on "special need" of Wisconsin's probation system, upholding state regulation permitting a probation search on only reasonable suspicion rather than requiring a warrant or probable cause); *United States v. Knights*, 534 U.S. 112, 114-22 (2001) (moving away from *Griffin*'s "special needs" analysis in favor of "totality of circumstances" test, and finding search conducted with only reasonable suspicion reasonable because government's interest outweighed probationer's privacy interest as his probation search condition "significantly diminished" his expectation of privacy); *see also Samson v. California*, 547 U.S. 843, 848-50 (2006) (finding Fourth Amendment does not prohibit a police officer from conducting a warrantless, suspicionless search of a parolee under a state parole-search statute, but also noting "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment.").

However, as one commentator noted, in *Samson v. California*, "the majority merely observed that 'we need not reach the issue whether acceptance of the search condition constitutes consent in the *Schneckloth* sense of a complete waiver of his Fourth Amendment rights[.]'"  5 Wayne R. LaFave, Search and Seizure § 10.10(b) n.62 (5th ed. 2015) (quoting *Samson*, 547 U.S. at 852 n.3 and citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)).  Rather, "*Samson* does say, [] just as does *Knights*, that it was relevant that the search condition . . . had been 'clearly

expressed' to petitioner." *Id.*; *see Knights*, 534 U.S. at 119-20 ("The probation order clearly expressed the search condition and Knights was unambiguously informed of it. The probation condition thus significantly diminished Knights' reasonable expectation of privacy."). But the Supreme Court has not decided whether a probation condition can "so diminish[], or completely eliminate[], [a probationer's] reasonable expectation of privacy . . . that a search by a law enforcement officer without any individualized suspicion [could] satisfy the reasonableness requirement of the Fourth Amendment." *Id.* at 120 n.6.

The Ninth Circuit subsequently addressed a similar issue in *United States v. King*, which considered whether to suppress evidence obtained during a suspicionless search of a probationer's home. 736 F.3d 805, 807 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1492 (2014). The defendant's probation agreement stated: "Defendant is subject to a warrantless search condition, as to defendant's person, property, premises and vehicle, any time of the day or night, with or without probable cause, by any peace, parole or probation officer." *Id.* at 806 (footnote omitted). The Court of Appeals held that "such a search is permissible when, as here, a violent felon has accepted a suspicionless-search condition as part of a probation agreement." *Id.* Stated another way, the Ninth Circuit held "only that a suspicionless search, conducted pursuant to a suspicionless-search condition of a violent felon's probation agreement, does not violate the Fourth Amendment." *Id.* at 810.

In arriving at this conclusion, the Ninth Circuit considered "the totality of the circumstances to determine whether the suspicionless search of Defendant's residence was reasonable[,] . . . . assess[ing] on the one hand, the degree to which the search intrudes upon Defendant's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 808 (quotations and internal marks omitted). First, the Ninth Circuit noted that, as a probationer, the defendant "begins with a lower expectation of privacy than is enjoyed by a citizen who is not subject to a criminal sanction." *Id.* (citing *Knights*, 534 U.S. at 119). Additionally, because the defendant-probationer had agreed to the probation search condition noted above, his lower expectation of privacy was further "significantly diminished[.]" *Id.* at 809. In comparing this "small" expectation of privacy, the Ninth Circuit

9

United States District Court
Northern District of California

1  noted the government had at least three "important interests": (1) "an interest in apprehending

2  violators of the criminal law, thereby protecting potential victims from probationers'

3  recidivism[;]" (2) "an interest in discovering criminal activity and preventing the destruction of

4  evidence[;]" and (3) "an interest in a probationer's successful completion of probation and in his

5  or her reintegration into society." *Id.* (quotation and internal marks omitted). "Balancing the

6  slight intrusion on Defendant's expectation of privacy against the government's significant need to

7  promote its legitimate governmental interests," the Ninth Circuit held the search reasonable under

8  the Fourth Amendment. *Id.* at 810.

9       A probationer's consent to searches as part of his or her probation condition is thus "a

10  salient circumstance" in weighing the reasonableness of a search and the probationer's legitimate

11  expectation of privacy. *Knights*, 534 U.S. at 118. The question then is how that search condition

12  might affect the expectations of privacy for a probationer's co-resident.

13       **2.    Exception to the Exception: Physically Present, Objecting Co-Occupant**

14       "[C]onsent by one resident of jointly occupied premises is generally sufficient to justify a

15  warrantless search[.]" *Fernandez v. California*, ⸺ U.S. ⸺, 134 S. Ct. 1126, 1132-33 (2014)[4]

16  ("'Consent searches are part of the standard investigatory techniques of law enforcement agencies'

17  and are 'a constitutionally permissible and wholly legitimate aspect of effective police activity.'"

18  (quoting *Schneckloth*, 412 U.S. at 228, 231-32)). "[A] person who shares a residence with others

19  assumes the risk that 'any one of them may admit visitors, with the consequence that a guest

20  obnoxious to one may nevertheless be admitted in his absence by another[.]'" *Id.* at 1133 (quoting

21  *Georgia v. Randolph*, 547 U.S. 103, 120 (2006)); *see also Lopez-Rodriguez v. Mukasey*, 536 F.3d

22  1012, 1018 (9th Cir. 2008) ("[T]he voluntary consent of a party who has authority over the

23  premises renders the warrantless entry of a person's home by law enforcement personnel

24  constitutionally valid[.]" (citation omitted)).

25       In *Georgia v. Randolph*, the Supreme Court reiterated a narrow exception to this rule,

26  holding that "a physically present inhabitant's express refusal of consent to a police search is

27

28  [4] The Supreme Court decided *Fernandez* on February 25, 2014—several months before the search here.

10

dispositive as to him, regardless of the consent of a fellow occupant."  547 U.S. at 122-23; *see also Fernandez*, 134 S. Ct. at 1134 (emphasizing *Randolph* does not extend to cases where the objector is not present and objecting).  Put another way, the Supreme Court has held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident."  *Id.* at 120 (footnote omitted) (holding search invalid under the Fourth Amendment when a physically-present occupant expressly objected to a search, notwithstanding the consent of a fellow occupant).[5]

Subsequent courts have applied *Randolph* in the context of parole and probation searches, even where the parolee or probationer gave consent to search.  In *Thornton v. Lund*, a court considered a similar case where two sisters sued officers for conducting a warrantless search of their home while looking for their parolee brother.  538 F. Supp. 2d 1053, 1055-56 (E.D. Wis. 2008).  As the court explained, the question was not about the parolee brother's expectation of privacy but "whether plaintiffs' own Fourth Amendment rights were diminished because defendants reasonably believed that William, a parolee, lived in their home."  *Id.* at 1058.  The court rejected that individuals living with parolees and probationers necessarily had diminished Fourth Amendment rights.  It noted that parolees and probationers have lower expectation of privacy as compared with other citizens because "their liberty is conditional and because the government 'clearly expressed' to them that they were subject to warrantless searches, and they acknowledged this 'unambiguously.'"  *Id.* (quoting *Samson*, 126 S. Ct. at 2199; *Knights*, 534 U.S. at 119-20).  But "[w]here, as here, the government gave the parolee's co-resident no notice of its intent to search and the co-resident did not consent to a search," the court found "the rationale for concluding that the co-resident has a diminished privacy interest evaporates."  *Id.*  Furthermore,

---

[5] California courts maintain a similar rule.  *See Tompkins v. Superior Ct. of City & Cty. of S.F.*, 59 Cal. 2d 65, 69 (1963) ("[O]ne joint occupant who is away from the premises may not authorize police officers to enter and search the premises over the objection of another joint occupant who is present at the time, at least where . . .  no prior warning is given, no emergency exists, and the officer fails even to disclose his purpose to the occupant who is present or to inform him that he has the consent of the absent occupant to enter.").

1    the *Thorton* court noted a parolee's consent to warrantless search is not sufficient to permit the

2    search over the objections of a physically present co-tenant.  *Id.*  Thus, "notwithstanding

3    William's consent, defendants' entry into and search of plaintiffs' home was unreasonable[.]"  *Id.*

4         Judge Anthony Ishii of the Eastern District of California adopted the *Thorton* court's logic

5    in *Sanders v. City of Bakersfield*, where a parolee, Ken McDaniel, resided with Arlene Sanders, a

6    non-parolee, at the time the police searched their home.  2009 WL 734059, at *1-3 (E.D. Cal. Mar.

7    17, 2009).  Sanders had demanded that the officers leave, but they entered the home despite her

8    non-consent, justifying the search as a parole search.  *Id.* at *1.  Judge Ishii found the search could

9    "not be justified as a parole search in relation to Arlene Sanders," relying on *Thorton* for the

10   proposition that *Randolph* set forth a new rule when a physically present resident refused consent,

11   even with parolee co-inhabitants who had agreed to such searches.  *Id.* at *2-3

12        Other courts have similarly acknowledged that *Randolph* has changed the typical analysis

13   for consent based searches, even in the context of probationers, although those courts have

14   declined to extend *Randolph* to cases where a probationer has already consented to such searches

15   and the probationer's co-resident did not object to the search or where the co-resident was aware

16   of the search condition.  For instance, in *Donald v. State*, the Delaware Supreme Court wrote that

17   "[w]hile a co-occupant does not forfeit her own Fourth Amendment rights by allowing a

18   probationer to live with her, she must object to the search to which the probationer has consented

19   in order to prevent a search without a warrant.  Because Donald did not do that, we conclude that

20   the Superior Court did not err when it denied the motion to suppress."  903 A.2d 315, 321 (Del.

21   2006).  Additionally, in *Taylor v. Brontoli*, the court briefly considered whether a co-resident's

22   refusal to consent to a search prevails over the other co-inhabitant's consent to search under that

23   person's probation agreement in light of *Randolph*.  2007 WL 1359713, at *1 n.4 (N.D.N.Y. May

24   8, 2007).  The defendants "maintain[ed] that the ruling in [*Randolph*] should not be extended to

25   the facts [t]here because it [wa]s undisputed that [the non-consenting co-resident] was aware that

26   [the other co-inhabitant] was on probation and that her trailer was subject to searches."  *Id.*  The

27   court agreed, finding that under the circumstances, *Randolph* was "distinguishable because [the]

28   residence was already subject to searches under a probation agreement."  *Id.*  Similar to *Thorton*,

United States District Court
Northern District of California

the implication of *Taylor* is that where the co-resident has no knowledge of the search condition applicable to their home, if that person is physically present and refused to the search, that refusal is dispositive as to him or her.  The foregoing cases demonstrate that courts interpret *Randolph* as potentially applicable even in the face of probation search conditions.

United States District Court
Northern District of California

### 3.   Method of Entry

The "method of an officer's entry into a dwelling" is a factor to be considered in assessing the reasonableness of a search.  *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995).  The "principle that officers must announce their presence and provide residents an opportunity to open the door" is "ancient" and commanded by the Fourth Amendment.  *Hudson v. Michigan*, 547 U.S. 586, 859 (2006).  The goals of the knock and announce principle include "protecting the sanctity of the home, preventing the unnecessary destruction of private property through forced entry, and avoiding violent confrontations that may occur if occupants of the home mistake law enforcement for intruders."  *United States v. Combs*, 394 F.3d 739, 744 (9th Cir.), *opinion amended on other grounds on denial of reh'g*, 412 F.3d 1020 (9th Cir. 2005) ("[T]he focus of the 'knock and announce' rule is properly not on what 'magic words' are spoken by the police, or whether the police rang the doorbell, but rather on how these words and other actions of the police will be perceived by the occupant." (quotation omitted)).  Unannounced entry by police officers exposes them "to the risk that an occupant would mistake their entry for an invasion and reasonably would take defensive measures to protect himself from the perceived, though mistaken, threat."  *Green v. Butler*, 420 F.3d 689, 698 (7th Cir. 2005) (citations omitted).  "In the same vein, observance of the knock and announce rule is a significant safeguard to the occupants of the home, including innocent third parties for whom the surprise of an unannounced entry by law enforcement officers might elicit panic or other forms of irrational conduct-action that easily can be misapprehended by law enforcement officers and result in deadly defensive measures on their part."  *Id.* (citations omitted).  And although most of the concerns surrounding the knock and announce rule focus on escalating emotions and reactionary decision-making, the Supreme Court has also emphasized basic civility and sanctity of the home, recognizing that one purpose of the rule is to protect the privacy of the occupants and give them an opportunity to prepare for the officers' entry, allowing

1   them "to pull on clothes or get out of bed." *Richards v. Wisconsin*, 520 U.S. 385, 393 n.5 (1997).

2       Thus, in order to be reasonable under the Fourth Amendment, police are generally required

3   "to announce their intent to search before entering closed premises;" however, the obligation

4   "gives way when officers have a reasonable suspicion that knocking and announcing their

5   presence, under the particular circumstances, would be dangerous or futile, or [] would inhibit the

6   effective investigation of the crime by, for example, allowing the destruction of evidence." *United*

7   *States v. Banks*, 540 U.S. 31, 36 (2003) (quotation omitted).  To determine whether an entry is

8   reasonable, courts must consider all the circumstances surrounding the entry, including, but not

9   limited to, officer safety, time of day, destructibility of evidence, the size of the residence, the

10  nature of the offense, and any other observations by law enforcement that would support a forced

11  entry.  *Combs*, 394 F.3d at 744.  Additionally, they must examine what, if any, notice the police

12  gave before entry and the likelihood that the notice alerted those inside the home to the officer's

13  presence and purpose.  *Id.* at 744-45.  Finally, a "probation search does not permit an exception to

14  the knock and announce requirement unless there are exigent circumstances or futility." *Portnoy*

15  *v. City of Davis*, 663 F. Supp. 2d 949, 957 (E.D. Cal. 2009) (citing *Green*, 420 F.3d at 699).

16  **B.      Qualified Immunity and Municipal Liability Standards**

17          1.      Qualified Immunity

18          "Qualified immunity shields federal and state officials from money damages" unless a

19  plaintiff demonstrates "(1) that the official violated a . . . constitutional right, and (2) that the right

20  was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct.

21  2074, 2080 (2011).  An official's conduct violates clearly established law when, at the time of the

22  challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable

23  official would have understood that what he is doing violates that right." *Anderson v. Creighton*,

24  483 U.S. 635, 640 (1987); *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011).  In making this

25  determination, courts consider the state of the law at the time of the alleged violation and the

26  information possessed by the official to determine whether a reasonable official in a particular

27  factual situation should have been on notice that his or her conduct was illegal.  *Inouye v. Kemna*,

28  504 F.3d 705, 712 (9th Cir. 2007).  "'[T]he salient question . . . is whether the state of the law' at

14

the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quotation omitted).  Courts exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.  *al-Kidd*, 131 S. Ct. at 2080.

   "The plaintiff bears the burden of proof that the right allegedly violated was clearly established." *Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014) (quotation omitted).  "To meet this standard the very action in question need not have previously been held unlawful." *Id.* (quotation and internal marks omitted).  This is particularly true in the Fourth Amendment context, where the constitutional standard of "reasonableness" demands a fact-specific inquiry. *Mattos*, 661 F.3d at 442.  The question is "whether a reasonable officer would have had fair notice that [the action] was unlawful[.]" *Tarabochia*, 766 F.3d at 1125 (quotation omitted).

   The Supreme Court has provided little guidance as to where courts should look to determine whether a particular right was clearly established at the time of the injury. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 n.32 (1982) (declining to define "the circumstances under which 'the state of the law' should be 'evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court.'" (quoting *Procunier v. Navarette*, 434 U.S. 555, 565 (1978)).  In the Ninth Circuit, courts begin the inquiry by looking to binding precedent. *Tarabochia*, 766 F.3d at 1125 (citing *Boyd v. Benton Cty.*, 374 F.3d 773, 781 (9th Cir. 2004)).  If the right is clearly established by decisional authority of the Supreme Court or this Circuit, the inquiry should come to an end. *Id.*  On the other hand, "[i]n the absence of binding precedent clearly establishing the constitutional right, 'we look to whatever decisional law is available . . . including decisions of state courts, other circuits, and district courts.'" *Id.* (quoting *Boyd*, 374 F.3d at 781).  Fundamentally, "[t]he qualified immunity doctrine rests on a balance between, on the one hand, society's interest in promoting public officials' observance of citizens' constitutional rights and, on the other, society's interest in assuring that public officials carry out their duties and thereby advance the public good." *Beier v. City of Lewiston*, 354 F.3d 1058, 1071 (9th Cir. 2004).
//

United States District Court
Northern District of California

15

2.      <u>Municipal Liability</u>

To hold a municipal entity liable for a constitutional violation, a plaintiff must show that an official's action that caused the plaintiff's injury was pursuant "to official municipal policy of some nature." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).  In other words, a local government may only be liable under § 1983 for its own action or inaction, not that of its employees.  *Monell*, 436 U.S. at 694; *see also Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).  To prevail, a plaintiff must go beyond the respondeat superior theory of liability and demonstrate that the alleged constitutional deprivation was the product of a policy or custom of the local governmental unit, because municipal liability must rest on the actions of the municipality and not the actions of the employees of the municipality.  *Id.*  The Supreme Court has emphasized that "[w]here a plaintiff claims that the municipality . . . has caused an employee to [violate a plaintiff's constitutional rights], rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) (citations omitted).  Thus, "a plaintiff seeking to impose liability on a municipality under § 1983" is required "to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  *Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1232-33 (9th Cir. 2011) (citations and quotation marks omitted).

Liability based on a municipal policy may be satisfied one of three ways: (1) when official policies or established customs inflict a constitutional injury; (2) when omissions or failures to act amount to a local government policy of "deliberate indifference" to constitutional rights; or (3) when a local government official with final policymaking authority ratifies a subordinate's unconstitutional conduct.  *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010) (synthesizing Supreme Court authorities).  "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Brown*, 520 U.S. at 404.  Moreover, "a local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights."  *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

16

In any case, a successful *Monell* claim must prove that a government entity's policy, practice, or custom is the "moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citation omitted).

**C.      Application to the Case at Bar**

As discussed below, based on the current record, the Court cannot grant summary judgment in favor of either Defendants or Plaintiffs related to the constitutionality of the search in this case because genuine issues of material fact remain as to the reasonableness of the search. However, the Court finds that the officer Defendants are entitled to qualified immunity on certain limited grounds and likewise that the City is entitled to summary judgment on the ground that Plaintiffs have not provided evidence that a City policy or custom was the moving force behind the potential constitutional violations in this case. The Court discusses each of the potential constitutional violations below and the potential liability of the Defendants.

1.      Searching Over Plaintiffs' Objections and Level of Suspicion Required

Plaintiffs argue they are entitled to summary judgment because the officers conducted the search in this case without reasonable suspicion, whereas Defendants argue they are entitled to summary judgment because no suspicion was required in part because Plaintiffs' son and co-resident consented to such searches as part of his probation search terms. The issue neither party truly addresses is whether Officer Tatum began the search of Plaintiffs' home before they objected. This fact matters because under *Georgia v. Randolph*, if the officers entered and searched the home over the objections of the physically present Plaintiffs, that was a violation of the Fourth Amendment regardless of Perez's consent. However, if Officer Tatum entered and began searching the home before they objected, the scope of Perez's earlier consent may play a greater role in analyzing Plaintiffs' privacy expectations—with the caveat that Officer Tatum's method of entry into the home may be considered more skeptically.

While both parties generally agree the officers conducted the search over Plaintiffs' objections while they were physically present, Plaintiffs do not move for summary judgment on this ground and instead present evidence indicating factual disputes about when Plaintiffs objected to the search compared with when Officer Tatum entered the home. Specifically, Plaintiffs proffer

17

United States District Court
Northern District of California

1    that "[t]he time that passed between the knock at the front door and when the family realized

2    Officer Tatum was standing behind them was within 30 seconds."  Pls.' Opp'n at 11 (citing L.

3    Barajas Decl. ¶ 3).  They also note "Defendants attempt to argue that Officer Tatum could hear the

4    conversation at the front door at the time he entered (Defs.' [Br.] at 3)," but assert "this fact is

5    disputed."  Pls.' Opp'n at 11.  Having carefully reviewed the record, it is unclear precisely when

6    the search began in relation to Plaintiffs' objections.  As such, the Court cannot grant Defendants

7    summary judgment on the ground that the search was constitutional as a matter of law, nor can the

8    Court grant Plaintiffs summary judgment on the ground that reasonable suspicion was required to

9    perform the search as discussed below.

10                    *a.        Searching Over Plaintiffs' Objections*

11            Defendants urge the Court against such a conclusion, requesting it find (1) *Randolph* does

12    not apply in the context of probation searches because "the 'special needs' of the state were never

13    considered" in that case, and (2) that under the circumstances here, the "state[']s interests prevail

14    over the objecting occupant[.]"  Defs.' Br. at 14-15.  But the Court is unconvinced these

15    arguments preclude the application of *Randolph*.  While *Randolph* did not consider the state's

16    interests as related to probationers, it is not the case that it did not consider the interests of the

17    state.  Rather, *Randolph* found that "in the balancing of competing individual and governmental

18    interests entailed by the bar to unreasonable searches, . . . the cooperative occupant's invitation

19    adds nothing to the government's side to counter the force of an objecting individual's claim to

20    security against the government's intrusion into his dwelling place."  547 U.S. at 114-15 (citation

21    omitted).  In comparing the individual's interest in protecting the sanctity of his home, the Court

22    found "[d]isputed permission is [] no match for this central value of the Fourth Amendment, and

23    the State's other countervailing claims do not add up to outweigh it."  *Id.* at 115.  The Court

24    recognized the general interest in expedient law enforcement and bringing criminal activity to

25    light but rejected that they outweighed the non-consenting individual's privacy interest.  *Id.* at 115

26    and n.5.  The Court concluded, "nothing in social custom or its reflection in private law argues for

27    placing a higher value on delving into private premises to search for evidence in the face of

28    disputed consent, than on requiring clear justification before the government searches private

                                                18

living quarters over a resident's objection."  *Id.* at 120.

Furthermore, as *Knights*, *Samson*, and *King* demonstrate, the focus has shifted in assessing the reasonableness of searches such as the one in this case, from the special needs doctrine articulated in *Griffin*, to the "general Fourth Amendment approach of 'examining the totality of the circumstances,'" and in probationer cases, "with the probation search condition being a salient circumstance."  *Knights*, 534 U.S. at 118 (quotation omitted).  Nonetheless, when Defendants argue the "special needs" of California's probation system outweigh the privacy rights of the objecting Plaintiffs, Defs.' Br. at 1, the Court takes the Defendants' general point that the Court should weigh the competing interests in this case in assessing the totality of the circumstances of the search if the officers entered over Plaintiffs' objections.  *See Randolph*, 547 U.S. at 125-26 (Breyer, J., concurring) (stressing the totality of the circumstances test "because, were the circumstances to change significantly, so should the result.").

In any event, under the totality of the circumstances, the Court finds that if the officers entered and searched Plaintiffs' home over their objections, they violated Plaintiffs' Fourth Amendment rights.  First, as discussed above, the general rule that consent by one resident of jointly occupied premises justifies a warrantless search is inapplicable here if the Plaintiffs were physically present and objected to the search.  Therefore, the threshold question is what reasonable expectation of privacy Plaintiffs had, regardless of the specific scope of Perez's consent.  Defendants argue "for purposes of Fourth Amendment analysis, Plaintiffs have a diminished expectation of privacy while their probationer son uses their home for a residence."  Defs.' Opp'n at 10, Dkt. No. 43 (citing *United States v. Matlock*, 415 U.S. 164, 171 (1974); *Lenz v. Winburn*, 51 F.3d 1540 (1995)).  But while a probationer "begins with a lower expectation of privacy than is enjoyed by a citizen who is not subject to a criminal sanction," *King*, 736 F.3d at 808 (citing *Knights*, 534 U.S. at 119), it is not clear that co-inhabitants of a probationer similarly have reduced privacy expectations merely because they reside with a probationer.

Part of the reason the probationers in *King* and *Knights* had reduced expectations of privacy was the fact that they accepted clear and unambiguous search conditions.  *Id.* at 808-09; *Knights*, 534 U.S. at 119-20.  Here, even if Perez accepted such a search condition, there is no

1    evidence his parents were "unambiguously informed" of that condition.  Indeed, there is evidence

2    Raul Barajas demanded the police show him a warrant before he would allow them to enter,

3    indicating he believed a warrant was necessary for them to search his home.  Furthermore,

4    although Perez had been on probation since November 2010, there is no evidence in the record

5    that the Rohnert Park Police ever conducted a probation search in the four years prior to this time.

6    Thus, even though the record reflects the Plaintiffs knew Perez was a probationer, "[w]here, as

7    here, the government gave the [probationer]'s co-resident no notice of its intent to search and the

8    co-resident did not consent to a search, the rationale for concluding that the co-resident has a

9    diminished privacy interest evaporates."  *Thornton*, 538 F. Supp. 2d at 1058; *cf. Taylor*, 2007 WL

10   1359713, at *1 n.4 (refusing to extend *Randolph* where "it [wa]s undisputed that [the non-

11   consenting co-inhabitant] was aware that [the other co-inhabitant] was on probation and that her

12   trailer was subject to searches.").[6]  Finally, police officers came to search Plaintiffs' home, as

13   opposed to officials from the probation department.  Thus, while Defendants argue "[i]t is simply

14   unreasonable that Plaintiffs would assume that their son's criminal conduct has no impact on their

15   privacy," Defs.' Reply at 4, Dkt. No. 53, even though Plaintiffs knew Perez was a probationer

16   subject to some requirements and restrictions as a result of that probation, they did not necessarily

17   expect to reduce their expectations of privacy to the degree of acknowledging that police officers

18   could come and search their home at random and without any individualized suspicion of specific

19   wrong-doing just because they allowed their probationer son to live with them.  Except for Perez's

20   probation and related criminal activities, there is nothing in the record reflecting that Plaintiffs had

21   any reduced expectation of privacy.[7]

22   _____

23   [6] The notion that advanced notice affects an individual's expectation of privacy has been
     criticized, however.  Specifically, if the "notion that the warrant and probable cause requirements

24   will give way in the face of a strong government interest where the defendant had advance notice
     of the government's claimed search authority, . . . then . . .the government would be free to subject

25   the rest of us to comprehensive surveillance 'merely by announcing half-hourly on television' the
     intention to do so."  5 Wayne R. LaFave, Search and Seizure § 10.10(c) (5th ed. 2015) (quotation

26   omitted).

27   [7] *But see Perez*, 884 F.2d at 1141-42 (indicating a co-resident's expectation of privacy is
     diminished to the expectation of privacy of another co-resident when it held that if a jury found

28   that the suspect for whom the government had an arrest warrant lived with the plaintiff, then the
     plaintiff did not have a claim for an unreasonable search under the Fourth Amendment).  An arrest

                                                    20

Turning to the Government's interests, the Ninth Circuit has recognized the following state interests related to searches of probationers: (1) "an interest in apprehending violators of the criminal law, thereby protecting potential victims from probationers' recidivism[;]" (2) "an interest in discovering criminal activity and preventing the destruction of evidence[;]" and (3) "an interest in a probationer's successful completion of probation and in his or her reintegration into society." *King*, 736 F.3d at 807-08. Defendants' arguments in this case confirm those interests are significant here as well, asserting "[t]he ability to monitor offenders such as Perez is crucial" because "he has not been a successful probationer" and he has demonstrated "that he would commit more crimes and perhaps more serious crimes." Defs.' Br. at 15.

Additionally, Defendants argue the government has an interest in conducting probation searches even where there are non-consenting co-inhabitants, arguing "[i]f a co-occupant could bar police entry at the door, the co-occupant could effectively thwart any unexpected search." *Id.* They assert "[i]t wouldn't take long for probationers to post objecting sentinels at the doors to thwart the purposes of probation." *Id.* Plaintiffs respond that *Randolph* limited its holding in a manner that alleviates Defendants' concern when it held that "a search over a tenant's objection would be unreasonable only 'as to him,' not as to consenting co-tenants." Pls.' Opp'n at 7 n.3 (citing *Randolph*, 547 U.S. at 120). The *Thorton* court suggested the same rationale, noting "[a] co-habitant's objection to a search does not affect its reasonableness as to the probationer or parolee and would not provide a basis for suppressing evidence against the probationer or parolee." 538 F. Supp. 2d at 1059 n.4 (citing *Randolph*, 547 U.S. at 119). Of course, these arguments fail to consider that the police would be less likely to enter a home in such circumstances if there is the possibility the probationer's co-inhabitant could bring a civil suit against those officers. At the same time, Defendants' argument that a co-inhabitant could thwart "any unexpected search" by refusing consent is limited. Specifically, *Randolph* does not speak to searches conducted with probable cause or exigent circumstances (or perhaps other levels of

---

warrant, however, is issued only on probable cause and after the interposition of a neutral magistrate—it is not based on the notion of consent.

suspicion).  It is limited solely to instances where a physically present co-inhabitant expressly refuses to consent to a warrantless search on the basis of consent by another resident.  *Randolph*, 547 U.S. at 120.  The combination of the foregoing arguments diminishes the government's interest in in being able to conduct suspicionless searches based solely on a probationer's consent.

*Randolph* further notes "the question whether the police might lawfully enter over objection in order to provide any protection that might be reasonable is easily answered yes."  547 U.S. at 118 ("[E]ven when . . . two persons quite clearly have equal rights in the place, as where two individuals are sharing an apartment on an equal basis, there may nonetheless sometimes exist a basis for giving greater recognition to the interests of one over the other . . . . [W]here the defendant has victimized the third-party . . . the emergency nature of the situation is such that the third-party consent should validate a warrantless search despite defendant's objections[.]" (quotation omitted)).  The Court acknowledged "the undoubted right of the police to enter in order to protect a victim[.]"  *Id.* at 118-19; *see also King*, 736 F.3d at 809 (similarly acknowledging "Defendant's expectation of privacy was small, in light of the serious and intimate nature of his underlying conviction for the willful infliction of corporal injury on a cohabitant.").  There is no indication in this case that the government had an interest in protecting the Barajas family from Perez or that they would have a diminished expectation of privacy based on the nature of Perez's prior criminal activities as related to them or their home.

In sum, the Court finds the *Randolph* rule is properly applied to the facts in this case as the government's limited interests in conducting this search do not outweigh Plaintiffs' continued interest in the privacy in their home.  Based on this record, a reasonable jury could find that Plaintiffs can prove Defendants violated their Fourth Amendment rights by entering their home and conducting a warrantless and suspicionless search of their joint premises over their express objections.  Consequently, in light of *Randolph*, the Court cannot grant Defendants' summary judgment motion on the ground that their search was constitutional.

But Defendants also move for summary judgment on the ground that the Defendant officers are entitled to qualified immunity for their decision to conduct a probation search of Plaintiffs' home over their objections.  In this respect, the Court agrees: Plaintiffs' rights under

these circumstances were not clearly established, i.e., a reasonable officer at the time would not have known that a probation search over such objections was unconstitutional.

Plaintiffs argue that *Randolph* was decided eight years before the search at issue here, and the weight of authority at that time held that *Randolph* applied to probation/parole searches. Pls.' Opp'n at 14 (citing *Thorton*, *Sanders*, and *Donald*). On the other hand, Defendants cite *Smith v. City of Santa Clara*, where the district court considered but did not decide whether *Randolph* applies to probation searches. 2013 WL 164191, at *8 (N.D. Cal. Jan. 15, 2013) ("the Court declines to resolve the underlying constitutional question of whether the Fourth Amendment permits a probation search where another resident of the house is present and objects.").[8] The *Smith* court instead concluded the officers in that case were entitled to qualified immunity because "officers would be reasonable to believe that a rule that applies to searches generally does not apply the same way to probation searches" and finding it was "not clearly established that Plaintiff's refusal could or should trump the consent included as a condition of [the probationer's] probation." *Id.* Plaintiffs distinguish *Smith* on the ground that in that case the officers had reasonable suspicion, and thus "[t]he question was whether, under *Randolph*, a co-tenant's objection meant the officer needed a warrant supported by probable cause." Pls.' Opp'n at 15. Plaintiffs pose the question here as "whether a reasonable officer would have understood by November 2014 that it was unlawful to perform a suspicionless search of a non-probationer's home, where she was present and objected to the search." *Id.*

The issue is whether a "reasonable official" in the officer's position "would have understood that what he is doing violates that right.'" *Mattos*, 661 F.3d at 442 ("Qualified immunity shields an officer from liability even if his or her action resulted from a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." (quotation and internal marks omitted)). *Sanders*, *Thorton*, and *Donald* are out-of-district decisions, and *Thorton* and

---

[8] In deciding not to resolve the constitutional issue, the *Smith* court cited the parties' failure to "present[] or brief[]" the issue. 2013 WL 164191, at *7. Perhaps as a consequence of the parties' limited briefing, the *Smith* court did not cite *Thorton*, *Sanders*, or any of the prior cases that applied *Randolph* in the context of probation searches. Furthermore, as Plaintiffs point out, there "was no dispute that the search in *Smith* was supported by reasonable suspicion, as an eye witness had seen the probationer participate in a violent crime that same day." Pls.' Opp'n at 5 n.1.

*Sanders* both considered parolee cases rather than probationer cases. *Smith*, meanwhile, is a more recent, in-district decision specifically dealing with probation searches. Given the uncertainty in the case law and the general absence of authority on this issue, reasonable officers at the time of the search could have concluded the issue of whether objecting co-residents could stop a probation search was not yet resolved. Accordingly, the Court agrees the Defendant officers are entitled to qualified immunity on the issue of conducting the probation search over Plaintiffs' objections.

### b.    Level of Suspicion Required

At the same time, the Court cannot grant Plaintiffs summary judgment on the ground that Defendants were required to have reasonable suspicion before entering Plaintiffs' home. First, regardless of what consent Perez gave, if Plaintiffs objected to the search, their refusal in these circumstances may make the search unreasonable as to them; thus, as the Court has found that *Randolph* may properly apply to this case, Plaintiffs' investigation into the level of suspicion required to search probationers' homes may be unnecessary if a jury finds the officers searched Plaintiffs' home over their objections. Indeed, Plaintiffs all but admit that is the case. In their Opposition, Plaintiffs rephrase the issue in this case as follows: "the question at issue here . . . [is] whether the state's interest outweighs the privacy expectation of *an objecting*, non-probationer tenant to be free from suspicionless searches of her home." Pls.' Opp'n at 5 n.1 (emphasis added).[9] To the Court, it does appear that issue is the proper one to be resolved.

The alternative—if the officers entered the home before Plaintiffs objected and based solely on Perez's consent as part of his probation condition—is more complicated. The parties, and indeed other courts, assume the co-resident probationer's consent is valid as against his other co-residents.[10] *See, e.g.*, *Donald*, 903 A.2d at 321; *Taylor*, 2007 WL 1359713, at *1 n.4. The

---

[9] In their Reply, Plaintiffs state they "did not consent to the search and the government did not notify them of its intent to search their home without suspicion of wrongdoing. In contrast, they objected to the search, yet Officer Tatum entered through the back door with his gun drawn and snuck up behind Plaintiffs while the officers at the front door were explaining why they were there." Pls.' Reply at 3, Dkt. No. 54.

[10] But in *Samson*, the Supreme Court undermined this theory of consent as waiving a co-resident's Fourth Amendment rights. Specifically, the petitioner in *Samson* argued against permitting suspicionless searches of parolees, arguing that suspicionless searches entail a "massive intrusion on the privacy interests of third persons solely because they reside with a parolee[,]" and that

United States District Court
Northern District of California

United States District Court
Northern District of California

Supreme Court has likewise reiterated that, except in a *Randolph* type situation where there are physically present, objecting co-occupants, "consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search[,]" because "a person who shares a residence with others assumes the risk that 'any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another[.]'" *Fernandez*, 134 S. Ct. at 1132-33 (quoting *Randolph*, 547 U.S. at 120).  As a consequence of this long-standing rule, California courts have widely accepted that "if others live with a probationer, the shared areas of their residence may be searched based on the probationer's consent, given in advance by agreeing to a search condition." *People v. Schmitz*, 55 Cal. 4th 909, 917 (2012) (analyzing, among other cases, *People v. Woods*, 21 Cal. 4th 688 (1999); *People v. Robles*, 23 Cal. 4th 789 (2000); *People v. Sanders*, 31 Cal. 4th 318 (2003)).

Consequently, if the officers entered and searched Plaintiffs' home based solely on Perez's probation condition and before Plaintiffs objected, the issue is whether they were permitted to do so based on Perez's consent as part of his probation condition.  Both sides accordingly analyze what Perez agreed to as part of his probation conditions.  Defendants assert "[t]he Ninth Circuit has ruled that California's consent/waiver system of probation allows the police to conduct a suspicionless search under a Fourth Amendment analysis."  *See* Defs.' Br. at 1-2, 10 (citing *King*, 736 F.3d at 808).  Meanwhile, Plaintiffs argue that, where the specific terms of a probation search condition—like Perez's—state only that searches may be "warrantless," such searches must a least be based on reasonable suspicion in light of *United States v. Gomez*, 2014 WL 1089288, at *14 (N.D. Cal. Mar. 14, 2014).  Pls.' Br. at 6-7.

The majority opinion of the Ninth Circuit in *United States v. King* is binding on this Court.

---

"[m]any reasonable citizens would think twice about associating with a person who subjects them to such risks."  *Samson v. State of Cal.*, 2006 WL 353467, at *7-8 (U.S. 2006) (citation omitted). The Supreme Court addressed "petitioner's concern that California's suspicionless [parole] search law frustrates reintegration efforts by permitting intrusions into the privacy interests of third parties" but found it "unavailing because that concern would arise under a suspicion-based regime."  547 U.S. at 856-57.  The Supreme Court's response appears to suggest that consent of one co-resident in the parole or probation context is not binding on co-residents, but rather that those persons are entitled to protections under a suspicion based regime.  But as far as this Court can find, no other court has analyzed what the Supreme Court meant by its statement that such a search would "arise under a suspicion-based regime."

25

United States District Court
Northern District of California

In a series of footnotes, the Ninth Circuit explains that "[o]nly after the meaning and scope of a search clause are determined, under state law, does the federal Fourth Amendment analysis begin." *King*, 736 F.3d at 815 n.3.  According to the majority, "[u]nder California law, Defendant's agreement to the warrantless search condition as part of his state-court probation was an agreement to be subject to suspicionless searches." *Id.* (citing *People v. Bravo*, 43 Cal. 3d 600 (1987) ("[A] search condition of probation that permits a search without a warrant also permits a search without 'reasonable cause[.]'")).  Simply put, under California law, a probation search term that only states searches may be "warrantless" also permits suspicionless searches.  *Id.*

Judge Berzon's dissent speaks adamantly against this interpretation, explaining "King's search condition did not plainly, clearly, and unambiguously provide notice that he was subject to searches without even reasonable suspicion."  *See King*, 736 F.3d at 814 (Berzon, J., dissenting). The dissent thus disavows the "majority's decision [which] . . . permit[s] such searches without *any* quantum of suspicion, as long as the probationer has assented to a warrantless search condition, no matter how ambiguously worded." *Id.* at 816 (emphasis in original).  Thus, when Plaintiffs cite *United States v. Gomez* for the proposition that "a search condition that includes only the possibility of a warrantless search does not, without more, clearly and unambiguously subject a probationer to a search without reasonable suspicion," this appears to adopt the logic of Judge Berzon's dissenting opinion.  *See* Pls.' Reply at 6 (citing *Gomez*, 2014 WL 1089288, at *14 (N.D. Cal. Mar. 14, 2014)).  Plaintiffs' conclusion that reasonable suspicion was required here based on the ambiguity in Perez's search term is therefore at odds with the majority decision in *King*.  *See King*, 736 F.3d at 815 n.3 (noting that "although the dissent plausibly parses King's search clause, California law at the time this search condition was imposed on King interpreted such clauses more broadly, to waive all claims of privacy. We are not at liberty to do otherwise.").

California law on this matter has not changed since the Ninth Circuit decided *King—Bravo* still applies in interpreting the scope of a probation search term in California.  And *Bravo* stands for the proposition that "a defendant who in order to obtain probation specifically agreed to submit to search 'with or without a warrant at any time'" has waived not "only the right to demand a warrant[,]" but also "'whatever claim of privacy he might otherwise have had.'" *Bravo*, 43 Cal. 3d

at 610 (quotation omitted)).  Given *Bravo* and the Ninth Circuit's requirement in *King* that

California law dictates the scope of the probation condition, this Court is left with the inexorable

conclusion that when Edgar Perez agreed to his probation conditions allowing a "warrantless

search/seizure" of his residence, he also consented to suspicionless searches of his residence.[11]

Thus, if a jury found Officer Tatum entered the home before Plaintiffs objected, Perez's

consent justified a suspicionless search of the home he shared with them.  *See Fernandez*, 134 S.

Ct. at 1133 (reiterating Supreme Court's long-stated position that "a person who shares a residence

with others assumes the risk that 'any one of them may admit visitors, with the consequence that a

guest obnoxious to one may nevertheless be admitted in his absence by another[.]'" (quoting

*Randolph*, 547 U.S. at 120)); *see also* Model Civ. Jury Instr. 9th Cir. 9.13 (2007) ("[A] search

warrant is not required and a search is reasonable if a person in lawful possession of the area to be

searched knowingly and voluntarily consents to the search and there is not any express refusal to

consent by another person who is physically present and also in lawful possession of the area to be

searched." (internal marks omitted)).[12]  This finding does not necessarily mean the search was

---

[11] Judge John B. Streeter of the California Court of Appeal recently identified an important aspect of probation search conditions in California, however.  Specifically, while a parolee's search condition is set by statute in California, Cal. Penal Code § 3067, conditions of probation may be imposed only "so long as they are 'fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from that breach, and generally and specifically for the reformation and rehabilitation of the probationer.'"  *People v. Douglas*, 240 Cal. App. 4th 855, 857 (2015), *as modified on denial of reh'g* (Oct. 19, 2015), *review filed* (Nov. 10, 2015) (quoting Cal. Penal Code § 1203.1(j)).  "The courts therefore attempt to individualize the terms and conditions of probation to fit the offender," meaning "probation search clauses are not worded uniformly."  *Id.* (citing *King*, 736 F.3d at 811 n.1 (Berzon, J., dissenting)); *see also People v. Romeo*, 240 Cal. App. 4th 931, 951 (2015) (Streeter, J.) ("[J]udges may limit the scope of the defendant's consent to searches for particular contraband, such as drugs or stolen property, or place spatial limits on where searches may take place. Some judges have 'standard' probation terms for particular crimes and particular circumstances . . . , but practices vary by county all over the state.").

[12] The Comments to the Model Jury Instruction explain:

> It is a well-settled exception to the warrant requirement that an "individual may waive his Fourth Amendment rights by giving voluntary and intelligent consent to a warrantless search of his person, property, or premises."  *United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir. 2000), *cert. denied*, 531 U.S. 1174 (2001).  *See also Ohio v. Robinette*, 519 U.S. 33, 40 (1996).  In *Georgia v. Randolph*, 126 S. Ct. 1515, 1518 (2006), the Supreme Court reiterated this rule: "The Fourth Amendment recognizes a valid

United States District Court
Northern District of California

automatically reasonable simply because of Perez's consent; it means only that the Court cannot grant Plaintiffs summary judgment on the ground that reasonable suspicion was categorically required to perform this search. *See Fernandez*, 134 S. Ct. at 1137 ("[T]he lawful occupant of a house or apartment should have the right to invite the police to enter the dwelling and conduct a search. Any other rule would trample on the rights of the occupant who is willing to consent."). Consequently, Plaintiffs' Motion for Summary Judgment on the ground that reasonable suspicion was necessarily required is denied and the officer Defendants are likewise entitled to qualified immunity on this ground.

### 2.   Officer Tatum's Method of Entry May Be Unreasonable

Plaintiffs argue they are entitled to summary judgment because "Defendants have a[n] [] unlawful practice of entering homes through the back door (with guns drawn) while officers at the front door are explaining why they are there." Pls.' Br. at 7.  In their Opposition, Plaintiffs explain "Officer Tatum violated the requirement that officers knock and announce their presence and wait a reasonable amount of time before entering." Pls.' Opp'n at 10.  Thus, Plaintiffs assert Defendants are at least not entitled to summary judgment given the circumstances of the search.

The Court agrees that a reasonable jury could find that evidence demonstrates the search was unreasonable and thus Defendants are not entitled to summary judgment.  As Plaintiffs submit, while Officers Rodriguez and Snodgrass approached the Barajas' front door, Officer Tatum let himself into the Barajas' backyard through a closed gate, and—despite there being no suspicion of wrongdoing—drew his firearm, and went inside the home through a back sliding door. Pls.' SUF ¶¶ 21, 23.  He did not knock, and was not invited into the home.  L. Barajas Decl.

---

warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Id.* at 1518. The Court, however, also held that, as between a wife's consent to a search of the family residence and her husband's refusal to consent, "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him." *Id.* at 1519.

Comments, Model Civ. Jury Instr. 9th Cir. 9.13 (2007).

United States District Court
Northern District of California

¶ 3 ("[Officer Tatum] did not knock and did not announce he was entering").  Once inside, Officer Tatum searched the back of the home (including a back room, the dining area and the kitchen) before he closed up behind the family, so that they were surrounded by officers.  *Id.*; Tatum Dep. 58:2-9.  Defendants have not shown there was any exigency for the search, and even if Officer Tatum heard Plaintiffs objecting to the search, a rational jury could reasonably believe Plaintiff's version of the facts, i.e., that Officer Tatum entered onto Plaintiffs' property with gun drawn and without announcing his presence, and conclude that his entry was unreasonable under the totality of the circumstances.  Indeed, a jury could find Officer Tatum's method of entry in tension with the goals of the knock and announce rule, risking both officer safety, safety of the home's inhabitants, and generally adding to the unnecessary escalation of the situation.

At the same time, the Court cannot grant Plaintiffs summary judgment.  Plaintiffs cite no authority supporting that Officer Tatum's actions violated the Fourth Amendment as a matter of law.  Rather, they tacitly ask the Court to assume the role of factfinder and determine the reasonableness of Officer Tatum's conduct.  But this is not the Court's role, particularly where the facts are still unclear as to precisely how and when he entered the home, what may have been communicated between the officers prior to entry, and what the officers knew about Perez's history with drugs and violence, etc.  As the Ninth Circuit reiterated, "it is generally inappropriate to grant summary judgment on the reasonableness of police conduct[.]"  *Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 868 (9th Cir. 2010) (citing *Howell v. Polk*, 532 F.3d 1025, 1027 (9th Cir. 2008) (per curiam) ("[W]e frequently entrust juries with the task of determining the reasonableness of police conduct."))  Given the available facts, the reasonableness of Officer Tatum's entry is a question for the jury.  *Id.* ("[S]ummary judgment is generally an inappropriate way to decide questions of reasonableness because the jury's unique competence in applying the reasonable man standard is thought ordinarily to preclude summary judgment." (quotation omitted)).

Finally, as to whether Officer Tatum is entitled to qualified immunity for his method of entry, Plaintiffs argue that "[w]hile the Ninth Circuit appears not to have reviewed a case with an analogous separate entry, it is clear from case law analyzing the knock and announce rule that

United States District Court
Northern District of California

Officer Tatum's entry was flatly inconsistent with the rule's purpose." Pls.' Opp'n at 12.  They argue the rule "protects privacy and dignity interests that can be destroyed by a sudden entrance and safeguards citizens and police from unnecessary violence resulting from surprise." *Id.*  As such, they contend Officer Tatum's method of entry was clearly established as unreasonable. *Id.*

If the jury accepts as true Plaintiffs' version of the facts, with Officer Tatum failing to knock and announce his presence, sidling through the Barajas' back door with gun drawn, and surprising the Barajas family when they found him standing inside their home, then the Court agrees with Plaintiffs that a reasonable officer in such circumstances would be on notice that his conduct was counter to aims and purpose of the knock and announce rule and could be considered an unreasonable method of entry under the Fourth Amendment.  As noted previously, unannounced entries risk the safety of the officers as an occupant could reasonably mistake the entry as an invasion and take defensive measures and likewise risk the safe of occupants in the home by causing panic or other forms of irrational conduct.  *See Green*, 420 F.3d at 698.  The knock and announce rule aims to prevent the escalation of tensions when law enforcement enters a home as well as to protect the sanctity of the home and give occupants an opportunity to prepare for the officers' entry.  *Richards*, 520 U.S. at 393.  Under Plaintiffs' version of events, Officer Tatum's actions both risked the escalation of situation and encroached on Plaintiff's privacy and the sanctity of their home, without any exigent circumstances and suspicion of danger or wrong-doing justifying his method of entry.  And even if Officer Tatum heard Plaintiffs objecting to the search, a reasonable officer could nonetheless conclude it was still violative of the Fourth Amendment to enter Plaintiffs' home in the way he did.  Thus, even though Plaintiffs have not presented case law on all fours with this case, considering the factors courts use to assess whether the method of an officer's entry was reasonable, and taking the facts in the light most favorable to Plaintiffs, a reasonable officer in Officer Tatum's position had fair warning his conduct was unconstitutional.

In sum, summary judgment is not appropriate on either Plaintiffs' or Defendants' motions concerning Officer Tatum's method of entry.

//

United States District Court
Northern District of California

3.      Search May Be Unreasonable If Conducted to Harass

Finally, Plaintiffs argue Defendants are not entitled to summary judgment because a reasonable jury could find the officers intended to harass Perez and his family when they decided to search the Barajas' home.  In California, "probation search is a recognized exception to the warrant requirement as long as the decision to search is not arbitrary or *intended to harass*." *People v. Downing*, 33 Cal. App. 4th 1641, 1650 (1995) (emphasis added) (citing *Bravo*, 43 Cal. 3d at 608); *see Bravo*, 43 Cal. 3d at 610 (searches of probationers may not be conducted for "reasons unrelated to the rehabilitative and reformative purposes of probation or other legitimate law enforcement purposes. . . . [and] a condition of probation does not permit searches undertaken for harassment[.]"); *see also King*, 736 F.3d at 810 (indicating a probation search could not be "conducted for illegitimate reasons, such as harassment.").

Plaintiffs point out that Perez has had multiple confrontations with Officers Tatum and Rodriguez.  Pls.' Opp'n at 13.  In November 2010, Officers Tatum and Rodriquez were in an altercation with Perez in front of his home and his family, during which they struck and tazed him. *Id.*; Pls.' SUF ¶¶ 1-6; L. Barajas Decl. ¶ 2.  In the six months prior to the incident in this case, Officer Tatum pulled Perez over while driving at least two times, admitting that the reason may have been solely because Perez was on probation.  Pls.' Opp'n at 13 (citing Pls.' SUF ¶¶ 47-48). Officer Tatum was also the one who decided the officers should perform the November 14, 2014 search. *Id.* (citing Pls.' SUF ¶ 8).  Then, on November 14, when talking with Plaintiffs, Officer Rodriguez made a point to identify himself as the same officer involved in the November 2010 incident. *Id.*; Gonzales Decl., Ex. D (R. Barajas Dep.) 30:20-31:10, Dkt. No. 41-4.  He also told Raul Barajas that Perez had broken his arm. *Id.*  As Plaintiffs point out, "[a] rational juror could easily conclude that Officer Rodriguez made this statement in order to elicit a response from Mr. Barajas."  Pls.' Opp'n at 14.  Finally, although Officer Snodgrass was not present at the November 2010 incident, he testified he knew about Officer Tatum's and Officer Rodriguez's history with Perez and that, at some point earlier in the day of the November 14 search, Officers Tatum and Rodriguez brought up the November 2010 incident.  Gonzales Decl., Ex. C (M. Snodgrass Dep.) 74:4-13, Dkt. No. 41-3.

United States District Court
Northern District of California

1   This evidence is not conclusive, but a rational jury could conclude based on these officers'

2   history with Plaintiffs and their son, and their interactions with Plaintiffs on the day of the search,

3   that they conducted the search for purposes of harassment rather than related to probation or other

4   legitimate law enforcement purposes.  *See, e.g.*, *Smith v. City of Oakland*, 538 F. Supp. 2d 1217,

5   1227 (N.D. Cal. 2008), *aff'd*, 379 F. App'x 647 (9th Cir. 2010) (albeit in a parole search case,

6   finding that "where the parole search was not based on probable cause or reasonable suspicion, the

7   jury was properly instructed to examine the motives and intent of [the] Officers . . . to insure that,

8   at the very least, the suspicionless search was not arbitrary, capricious, or harassing.").  As such,

9   this is yet another basis for which the Court cannot grant Defendants summary judgment.

10   As to qualified immunity, Plaintiffs argue "[a] search performed to harass is

11   unconstitutional and no reasonable officer could have believed otherwise in November 2014."

12   Pls.' Opp'n at 12.  In doing so, they cite both the Supreme Court's opinion in *Samson v.*

13   *California*, as well as the Ninth Circuit's opinion in *United States v. King*, both of which condemn

14   harassing searches.  *Id.*; *see Samson* 547 U.S. at 856 (recognizing California's prohibition on

15   harassing searches as a procedural safeguard under the Fourth Amendment); *King*, 736 F.3d at 810

16   (probation may not be "conducted for illegitimate reasons, such as harassment.").  The Court

17   agrees with Plaintiffs that if a jury found the Defendant officers intended to harass Plaintiffs or

18   Perez in conducting the search, then a reasonable officer in such a position would understand that

19   such actions violate Plaintiffs' rights to be free from unreasonable searches.  Accordingly, the

20   officers are not entitled to qualified immunity on this ground.

21       4.    <u>Summary of Constitutional Violations</u>

22   In sum, the Court finds Defendants are not entitled to summary judgment on the ground

23   that their search was reasonable.  First, a reasonable jury could conclude it was unreasonable for

24   the officers to enter Plaintiffs' home over their objections without a warrant and without

25   reasonable suspicion.  Second, such a jury could also find Officer Tatum's method of entry into

26   the home was unreasonable.  Finally, Plaintiffs have also provided evidence raising a triable issue

27   of fact about whether the officers' purpose in conducting the search was to harass.  Under these

28   circumstances, the Court cannot grant Defendants summary judgment on the grounds that the

search was per se reasonable and constitutional.

Likewise, the Court cannot grant Plaintiffs summary judgment on the ground that the search was per se unreasonable because the officers did not have reasonable suspicion to search or on the ground of Officer Tatum's method of entry.  Instead, given the facts available, the Court finds the determination of the reasonableness of the officers' conduct is more appropriately considered by a jury.  Nonetheless, the Court grants the Defendant officers qualified immunity on the narrow ground that it was not clearly established that the *Randolph* rule applies in the context of probation searches.  Accordingly, the Defendant officers are immune from liability on the issue of whether it was unreasonable for them to enter Plaintiffs' home over their objections to conduct a suspicionless probation search as consented to by their son and co-occupant.  They must nevertheless stand trial as to the reasonableness of their search with respect to whether the method of entry was reasonable and whether the search was intended to harass.

### 5.   *Monell* Liability

Plaintiffs' *Monell* liability evidence focuses almost exclusively on the City's policy or custom concerning probation searches conducted without suspicion.  The Court has not found this theory to be a viable constitutional claim, however, and as such, Plaintiffs cannot maintain a related *Monell* claim.

The Court has, however, found three constitutional claims that could be viable if proven by Plaintiffs, i.e., (1) a potential violation of the *Randolph* rule, (2) Officer Tatum's potentially unreasonable method of entry, and (3) the potential harassment of citizens through searching their homes.  Thus, the issue is whether a Rohnert Park policy or custom was the moving force behind these potential constitutional violations.  *See Dougherty*, 654 F.3d at 900 ("A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a *moving force* behind a violation of constitutional rights." (emphasis added)).

Defendants generally argue that none of the potential constitutional violations in this case can attach liability to the City because "[i]t is black letter law in the Ninth Circuit that liability for improper custom may not be predicated on isolated or sporadic incidents."  Defs.' Br. at 14 (citing *Hunter*, 652 F.3d at 1233).  While that is generally the case, *Hunter* also explains in a footnote that

United States District Court
Northern District of California

33

"in some circumstances a *policy* of inaction, such as a policy of failing to properly train employees, may form the basis for municipal liability." *See Hunter*, 652 F.3d at 1235 n.8 (citations omitted; emphasis in original)). *Hunter* cites *Connick v. Thompson* in recognizing that "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id.* (quoting *Connick*, 131 S. Ct. at 1359).

The Ninth Circuit has explained that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *City of Canton*, 489 U.S. at 388). A plaintiff "must demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim." *Id.*; *see also City of Canton*, 489 U.S. at 389 ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers." (quotation omitted)). "[T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 390-91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."). Thus, "[t]he issue in a case like this one . . . is whether that training program is adequate; and if it is not, . . . whether such inadequate training can justifiably be said to represent 'city policy.'" *Id.* at 390.

Furthermore, ratification of the decisions of a subordinate by an official with final decision-making authority can be a policy for purposes of municipal liability under § 1983. *See Trevino v. Gates*, 99 F.3d 911, 920-21 (9th Cir. 1996) ("We have found municipal liability on the basis of ratification when the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation."), *holding modified on other ground by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001). But "the mere failure to investigate the basis of a subordinate's discretionary decisions" is not considered a ratification of those decisions. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). Moreover, mere acquiescence in a single

United States District Court
Northern District of California

34

United States District Court
Northern District of California

1    instance of alleged unconstitutional conduct is not sufficient to demonstrate ratification of a

2    subordinate's acts.  *See Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992).

3        Accordingly, bearing in mind that a *Monell* claim can be based on a policy of action or

4    inaction, the Court turns to the potential municipal claims in this case.  First, as to whether the

5    City has a policy allowing officers to harass citizens through searching their homes, there is no

6    evidence to support this claim.  Specifically, there is no evidence suggesting the City had an active

7    policy or practice that officers should harass citizens by searching or that a final decision-making

8    authority in the City ratified such conduct.  Furthermore, to the extent such a claim could be

9    premised on a failure to train theory, "[w]here the proper response . . . is obvious to all without

10   training or supervision, then the failure to train or supervise is generally not 'so likely' to produce

11   a wrong decision as to support an inference of deliberate indifference by city policymakers to the

12   need to train or supervise."  *Flores*, 758 F.3d at 1160 (finding that in light of the regular law

13   enforcement duties of a police officer there was not a patently obvious need for the city to train

14   officers not to rape young women).  Given (1) the Defendant officers' general law enforcement

15   duties, (2) the longstanding California law that "a condition of probation does not permit searches

16   undertaken for harassment[,]" *Bravo*, 43 Cal. 3d at 610,[13] and (3) the absence of evidence showing

17   the likelihood that different training would have changed the search in this case, there is no

18   patently obvious need for the City to have specifically trained Officers not to harass people

19   through searches.  Accordingly, liability does not attach to the City for the potential harassment in

20   this case.

21       Second, as to Officer Tatum's method of entry, the Court finds Plaintiffs have raised

22   enough specific facts to preclude summary judgment for the City.  Plaintiffs point to the testimony

23   of Sergeant Jeff Justice, the City's 30(b)(6) witness designated to testify about its training and

24   practices pertaining to probation searches, who testified he trained Rohnert Park police officers to

25   conduct probation searches in this manner.  Pls.' SUF ¶¶ 30, 34.  Although it is unclear what he

26   _____

27   [13] *See also* Cal. Penal Code § 3067(d) (in the context of parole searches, noting "[i]t is not the
     intent of the Legislature to authorize law enforcement officers to conduct searches for the sole
28   purpose of harassment.").

1    means by "in this manner," Sergeant Justice, testifying on behalf of the City, also stated that, even

2    absent exigent circumstances, if an officer at the back of a home "doesn't know whether or not

3    [the officers in the front] made contact with anyone and he knows that they've attempted *or are*

4    *going to be attempting contact*, and he sees a way into the house, then he could go in through that

5    way into the house[,]" with gun drawn and before any words are exchanged.  Gonzalez Decl., Ex.

6    D (Justice Dep.) at 44:3-12, Dkt. No. 38-4.  Additionally, Officer Snodgrass testified he did not

7    report anything to his supervisors about Officer Tatum's entry because having an officer enter

8    through the back before officers enter through the front is the Rohnert Park Police Department's

9    "practice. That's happened before."  Pls.' SUF ¶ 28.  Indeed, Officer Tatum has entered through a

10   rear door during probation searches 50-60 times before other officers have entered through the

11   front door and testified that this was consistent with his training.  *Id.* ¶¶ 25-27.  While these

12   statements do not necessarily mean it is Rohnert Park's normal practice to have officers enter

13   homes in the manner done in this case, this evidence at least creates a genuine question of material

14   fact about the City's policy or practice related to the method of entry in probation searches, and

15   such a question is properly resolved by jury.

16          However, as to the potential violation of the *Randolph* rule, the Court concludes the parties

17   have not sufficiently addressed *Monell* liability for this claim.  Both parties focused more on

18   whether *Randolph* actually applied in this case but did not devote much argument or evidence as

19   to whether the City's action or inaction was the moving force behind the potential violation of the

20   *Randolph* rule.  Thus, the Court denies Defendants' Motion for Summary Judgment as to

21   Plaintiffs' § 1983 claims against the City as to the *Randolph* rule, but does so without prejudice in

22   the event Defendants wish to file another motion addressing the City's possible liability on this

23   claim.[14]  *See Galbraith v. Cty. of Santa Clara*, 2005 WL 2894782, at *4 (N.D. Cal. Nov. 2, 2005)

24   (denying summary judgment to county without prejudice where parties had not sufficiently

25   _____

26   [14] *But see Owens v. City of Independence*, 445 U.S. 622, 650-52, 657 (1980) (holding individual
     officers' entitlement to qualified immunity does not immunize municipalities from *Monell*

27   liability); *see also Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1186 n.7 (9th Cir. 2002) (noting
     "a municipality may be liable if an individual officer is exonerated on the basis of the defense of

28   qualified immunity").

addressed municipal liability or whether sufficient evidence supported claims against the county).

**CONCLUSION**

Based on the analysis above, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment and **DENIES** Plaintiffs' Motion for Summary Judgment as follows:

(1) The Court **DENIES** Defendants summary judgment on the ground that the search in this case was constitutional as there are genuine disputes of material fact about (1) whether the search was conducted over the express objections of the physically present Plaintiffs; (2) whether Officer Tatum's method of entry was unreasonable; and (3) whether the search was conducted to harass.

(2) The Court **GRANTS** Defendant officers qualified immunity on the claim that they violated Plaintiffs' rights under the rule set forth in *Georgia v. Randolph*, as it was not clearly established that this rule applied in the context of probation searches.

(3) The Court **DENIES** Defendant officers qualified immunity on Plaintiffs' claims that the search was conducted to harass.

(4) The Court **DENIES** Officer Tatum qualified immunity on Plaintiffs' claims that his method of entry was unreasonable.

(5) The Court **DENIES** Plaintiffs summary judgment on the ground that reasonable suspicion was required to perform the search in this case under the Ninth Circuit's decision in *King* and the California Supreme Court's decision in *Bravo*.  The Court thus also **GRANTS** Defendant officers qualified immunity on this claim.

(6) The Court **GRANTS** the City summary judgment on Plaintiffs' municipal liability claim related to whether a City policy or custom was the moving force behind the officers' potential decision to conduct the search to harass.

(7) The Court **DENIES** the City summary judgment on Plaintiffs' municipal liability claim concerning whether a City policy or custom was the moving force behind Officer Tatum's potentially unreasonable method of entry.

(8) The Court **DENIES** the City summary judgment **WITHOUT PREJUDICE** on

Plaintiffs' municipal liability claim concerning whether a City policy or custom was the moving force behind the potential *Randolph* rule violation.

A related scheduling Order is forthcoming.

**IT IS SO ORDERED.**

Dated: February 5, 2016

_____

MARIA-ELENA JAMES
United States Magistrate Judge