David F. Beach, Bar No. 127135
Scott A. Lewis, Bar No. 149094
PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ, LLP
438 1st Street, 4th Floor
Santa Rosa, California 95401
Telephone: (707) 525-8800
Facsimile: (707) 545-8242

Attorneys for Defendants
CITY OF ROHNERT PARK, JACY TATUM, DAVID RODRIGUEZ, MATTHEW SNODGRASS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| RAUL BARAJAS and ELVA BARAJAS,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF ROHNERT PARK, a municipal corporation; and JACY TATUM, DAVID RODRIGUEZ and MATTHEW SNODGRASS, officers with the City of Rohnert Park Police Department,<br><br>Defendants.<br>_____ / | Case No. 3:14-cv-05157 MEJ<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTION** |

## I.  INTRODUCTION

Plaintiffs are seeking permanent injunctive relief asking the Court to interfere with Rohnert Park's system of probation supervision without any evidence that this case is anything more than an isolated incident. There is no evidence of past injuries (custom or practice), no evidence of present injuries (a compensated plaintiff renders the subject as to them moot) and no proof of future injuries. Plaintiffs' hypothetical questions do not support injunctive relief.

Further, Plaintiffs' motion for injunctive relief fails to demonstrate key requirements for

such relief as well as the failure to support their request with evidence adduced at trial.

This matter represents a singular incident where money damages is adequate.

## II.     STANDARD REQUIREMENTS FOR OBTAINING INJUNCTIVE RELIEF

Respectfully, Plaintiffs' odd request for injunctive relief fails to cite, argue and support the requirements for such relief. Instead, Plaintiffs appear to take the position, by simply listing their requests, that damages equals relief. However, permanent injunctive relief is an "extraordinary remedy, never awarded as of right." *Winter v. Natural Res. Defense Council* ( 9th Cir. 2008) 555 U.S. 7, 24. "Under 'well-established principles of equity,' a plaintiff seeking permanent injunctive relief must satisfy a four -factor test by showing: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv*. (9th Cir. 2015) 789 F.3d 1075, 1088.

The United States Supreme Court informs us that to obtain an injunction, Plaintiffs must demonstrate either present continuing injury or the likelihood of future injury. *City of Los Angeles v. Lyons* (9th Cir. 1983), 461 U.S. 95.

Plaintiffs have not met this burden. The instant judgment represents the culmination of three years of litigation. During that time, Plaintiffs had every opportunity in the world to assess whether or not there were previous 4th Amendment injuries of this nature, or whether since the 2014 search, there were continuing injuries. Plaintiffs have presented no evidence in their Request to suggest that the case at bar is nothing more than an isolated incident. In fact, Defendants testified to hundreds of examples of probation searches including participating in searches of allied agencies for many years. There is not a single example of improper conduct. Minimal monetary damages have been awarded. Thus, there is no "irreparable injury" because Plaintiffs have been adequately compensated.

### III. <u>OVERVIEW OF PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF</u>

Plaintiffs appear to be seeking injunctive relief from the Court based on seven conceptual areas. Listed and treated in order as they appear in the moving papers, the requests seems to be (1) Banning probation searches; (2) Entering through the rear door before tenants have an opportunity to comply; (3) Searching every room; (4) Detaining all occupants; (5) Performing probation searches when no one is home; (6) Ordering a policy; and (7) Ordering training (though not numbered).

As a threshold issue, Plaintiffs superficial presentation of past and future conduct does not support injunctive relief. For example, at page two of Plaintiffs' brief, Counsel asks Sergeant Justice a hypothetical question about whether or not a person can be searched based on a probation condition. This is not evidence of past injuries nor evidence of future injuries. It is simply a hypothetical question.

Similarly, Plaintiffs ask Officer Rodriquez whether he should consider whether consent is a factor in entering a home and doing a probation search, or whether they have been accused of having a committed a new crime. (Plaintiffs' Brief p. 3).

These hypothetical questions and attendant answers are not evidence to support injunctive relief. There is not a single shred of evidence after three years of litigation that Defendants are engaged in any pattern, practice, custom or otherwise of improper police conduct.

They have not shown a single act of illegal conduct, improper conduct or even a series of complaints at any level.

### IV. <u>THE FACTS ADDUCED AT TRIAL</u>

Before the Court exercises the awesome power of injunction, Defendants asks the Court to keep in mind several important evidentiary milestones. First, Plaintiff Elva Barajas has testified that the Defendant Officers were polite, professional and apologetic. (Trial Transcript ("TT") 427:7-17.) Second, Officer Tatum testified that he believed Edgar Perez had violated his probation by dealing drugs. (TT 259:1-3.) Third, the search was conducted in according with

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

[1]the search condition (time of day). Fourth, the Officers knocked at the door and were polite. Fifth, no one was injured, handcuffed or treated unfairly. The evidence adduced at trial, on its worst day, can be reduced to two potential areas that the jury found unreasonable: Tatum's entering moments too early (Plaintiffs' clearly refused admittance with a locked door) and searching the whole house (Edgar Perez could have been hiding anywhere).

And, akin to the failed harassment claim, Officer Tatum testified that he had identified two people in Rohnert Park for compliance searches. As to Edgar Perez, Tatum testified that Edgar Perez was suspected of dealing narcotics and possessing a weapon. (TT 259:1-3; 260:7-17.) Without special interrogatories to the jury, and, without other evidence, this is reasonable suspicion that Perez was committing a crime and violating the terms of his probation.

Officer Tatum, Rodriquez and Snodgrass went to the home at a reasonable hour. Snodgrass and Rodriquez spoke to Mr. Barajas. He refused to allow them entry based on his requirement that the police "show him papers." (TT 191:18-22; 149:11-23.)

From a legal standpoint, debating the need for a search warrant is tantamount to refusing entry.

Tatum testified as follows regarding the entry:

> Q. …did you have an understanding that Officer Rodriguez had walked up to the front of the door?
> A. I did, yes, sir.
> Q. And you had an understanding that his role was to contact the people inside, correct?
> A. Yes, it was.
> Q. And was it your understanding that he had made contact with those people?
> A. Yes.
> Q. And at that point did you enter the home?
> A. I did. Yes, sir.
> Q. When I say "home," I want to be specific about where you were with regards to the fence and what point did you hear the -- you had that understanding that he had made contact with the family. Do you remember exactly where you were?
> A. I was to the left of the front door at the gate. I could

---

[1] Copies of all trial transcript excerpts cited herein are attached to Scott Lewis' Declaration as Exhibit A.

> see through the gate a little bit and I could hear Officer
> Rodriguez talking. And then as I said, I heard Matt say, We're
> out with somebody. Or, We're out with somebody at the front.
> And that's when I said, Copy, entering through the back.
> (TT 256:11-257:5.)

As the jury instructions indicate, Officers may enter through other locations, when knock and notice is accomplished at one location. Knock and notice was clearly accomplished according to Tatum's testimony.

As to Officers Rodriquez and Snodgrass, Plaintiffs allowed the Officers to enter and they conducted a search for Edgar Perez. From a legal and commonsensical perspective, Perez had plenty of time to run and hide in a closet. The Court may recall that the uncontroverted evidence showed that Perez' vehicle was outside the home. (TT 187:9-188:9; 262:4-10.) Further, officers are allowed to conduct a protective sweep of the house to protect themselves from assault. (TT 200:8-12.)

**(1) Banning Probation Searches**

Before the Court can enjoin a police practice and invoke the awesome power of federal law, Plaintiffs must establish with greater clarity exactly what they are seeking. For example, are Plaintiffs asking the Court to ban probation searches for the City of Rohnert Park or are they seeking an injunction against probation compliance searches? The uncontradicted evidence shows that the City participates in probation compliance searches with as many as thirteen agencies including three federal agencies.

**Officer Rodriguez Testimony:**

> Q. And when you were in Rohnert Park, did you participate in searches there?
> A. Yes.
> Q. And did you participate in residential searches?
> A. Yes.
> Q. With regards to your training back in the academy days going forward to Rohnert Park, was it the same type of search techniques practiced in the academy as well as Rohnert Park?
> A. Yes.
> Q. In regards to those same training techniques, did you ever have occasion to work with other agencies other than Rohnert Park?

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

A. Yes.
Q. Can you tell us those agencies?
A. So when I got to Rohnert Park, after about eight months I was assigned to our Special Enforcement Unit. And it was a four-man unit. Our job was to target career criminals and gang members and drug dealers and do investigations that patrol didn't have the time to do. So we didn't have to go to calls. So we would pick up investigations from them or start our own. So in that capacity, we worked with every agency in the county. We even worked with Marin County law enforcement and conducted search warrants and probation searches and parole searches.
Q. And so were the techniques you practiced with those agencies in engaging residential searches the same as you learned in the police academy?
Did you have occasion to search with other agencies using the same techniques?
A. Yes.
Q. And when you did those searches with other agencies, do you remember the names of those agencies specifically?
A. Yes.
Q. Can you tell us what those were?
A. Sonoma County Sheriff's Department, Santa Rosa Police Department, Sonoma County probation department, state parole, California Highway Patrol, Sebastopol police, Petaluma Police Department, Cloverdale Police Department. County multi-agency gang task force. The County's major crime task force. The ATF, alcohol tobacco and firearms. The FBI. The DEA, the Drug Enforcement Agency.
Q. Okay. So when we have discussed with the other officers so far the concept of the contact officer, was that the same as you experienced with all these other agencies?
A. Yes.
(TT 162:5-164:75.)

**Sergeant Justice Testimony:**

Q. Now, you've participated in probation searches with other organizations, is that correct?
A. Yes.
Q. And it's the same type of tactical process for the other agencies that you've personally experienced and participated in?
Yes. I have multiple times.
Q. Can you tell us the agencies that you've participated in these type of search tactics that you've seen and participated with them?
A. Starting with the probation department, Sonoma County

> Probation Department, Santa Rosa Police Department, Sonoma County Sheriff's Department, Petaluma Police Department, Sebastopol Police Department, Cloverdale Police Department. Pretty much every agency within the county.
> Q. Have you ever done it with national agencies?
> A. Yes. With FBI, U.S. Marshals.
> Q. The same type of tactical approach?
> A. Yes.
> (TT 543:6-544:3.)

Under the third prong of the test for an equitable remedy, the Court must balance the respective harms between Plaintiffs and Defendant. Defendant Rohnert Park is not just simply a governmental entity. Plaintiffs obscure request impacts basic public safety. Besides the lack of clarity, Plaintiffs seem to be asking the Court to institute what is called a "trigger" for a probation search. A trigger is an event or crime committed by the probationer that results in a probation search. Plaintiffs truncated briefing and the lack of continuing injury, suggests that establishing a new rule of law for Rohnert Park and a different search rule for the potential 13 other agencies visiting the City's criminals would be a reckless use of the Court's power.

From the two-page briefing, it is unclear whether Plaintiffs are advocating for an order regarding misdemeanants or felons? Are Plaintiffs seeking an order that Rohnert Park establish a trigger in the form of reasonable suspicion or probable cause for probation searches while other supportive agencies are not required to have suspicion of some form?

From an evidentiary perspective, Plaintiffs proffered evidence does not support the justiciability test (likelihood of recurrence). For example, Plaintiffs questions and testimony at trial simply asked prospective hypotheticals. Other than this one event, there is no other evidence of any other violations of Rohnert Park's probation search practices—no lawsuits or even complaints. Indeed, the Plaintiffs' home has been searched once and, because they are not probationers, they are not likely to get searched again.

From a practical perspective, there is no evidentiary basis established on how the Court would implement an order where the request is so vague. If allied agencies ask Rohnert Park for assistance during probation sweeps, is Rohnert Park allowed to do so? Must they query whether a probation trigger has been established? Must they demur from participating at all and therefore

risk the lives of the Officers who have asked them for help?

In summary, Plaintiffs' request for injunctive relief is far too vague for the relief they are seeking.

**(2) Entering through the rear door before tenants have an opportunity to comply.**

Plaintiffs next seek an order which appears to bar Officers of the Rohnert Park Public Safety Department from entering any home before "tenants" have an opportunity to comply.

This one-page request is misleading because Officers have the ability to enter a home during probation searches for a variety of reasons that have nothing to do with being "refused admittance."

The correct law, known as the "knock and announce" statutes and the methodology to interpret the legality of the police action is California Penal Code Section 844 and 18 U.S.C. § 3109. Penal Code Section 844 states as follows:

> To make an arrest, a private person, if the offense is a felony, and in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing the person to be, after having demanded admittance and explained the purpose for which admittance is desired.

There is nothing in California law which requires the police to give an occupant "an opportunity to comply." (the vagueness of Plaintiffs' Section 2 request notwithstanding).

Importantly, Plaintiffs abbreviated request does not articulate a precise definition nor is it supported by case law that would help this Court and, indeed, this opposition, on exactly what Plaintiffs are asking the Court to do or what the City could potentially comply with. The case at bar is a specific example. It is undisputed that Officers knocked on the door. (TT 108:14-15; 123:3-5.)  It is undisputed that Officers explained first, the reason they were at the door, i.e. a probation search. (TT 108:14-20; 191:18-22.)  It is also undisputed that Plaintiffs failed to open the door and allow the search (hence the polite conversation that ensued). (TT 149:11-23.) Thus, Officers, including Tatum, followed California law.

Federal law has a slightly different requirement. 18 U.S.C.A. 3109 explains that, "the

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

The correct inquiry under federal law is whether (1) Defendants knocked and explained their purpose and (2) Plaintiffs "refused admittance."

"Refused admittance" in the Ninth Circuit is defined as follows:

> "In sum, both the case law and analysis of the policy bases of the rule of announcement support the following standards regarding "refusal of admittance" once a proper section 3109 announcement has been made: entry is permissible simultaneously with or shortly after announcement if there is a likelihood that the occupants will attempt to escape, resist, destroy evidence, or harm someone within and if a nonforcible entry is possible; more specific inferences of exigency are necessary if entry may be obtained only by the physical destruction of property; an explicit refusal of admittance or lapse of a significant amount of time is necessary if the officers have no facts indicating exigency."
> *U.S. v. Bustamante-Gamez* (9th Cir. 1973) 488 F.2d 4, 12.

There is no doubt officers satisfied the first requirement. They knocked and talked. (TT 108:14-20; 123:3-5; 191:18-22.) They explained to them why they were there.

However, a homeowner has no right to prevent officers armed with a warrant or proper grounds to make a warrantless entry from entering his house; at most, the "refusal of admittance" requirement of this section gives the homeowner a few moments to decide whether or not he will open the door himself. *Bustamante-Gamez*, *supra,* 488 F.2d at 11.

It is plain that Raul Barajas did not allow police entry. Instead, he sought to debate the officers on the quantum of paperwork that had to be produced before he unlocked the outer door. The refusal to allow the police entry does not contemplate a debate at the front door.

**Jacy Tatum testified**:

> A. I was to the left of the front door at the gate. I could see through the gate a little bit and I could hear Officer Rodriguez talking. And then as I said, I heard Matt say, We're out with somebody. Or, We're out with somebody at the front.

> And that's when I said, Copy, entering through the back.
> (TT 256:11-257:5.)

> Q. At what point did you hear people talking?
> A. At some point when I was in the converted living space. That's why I did a quick search. Continued to hear my partners talking up front, which meant -- I couldn't hear what they were saying, but I knew they were in contact with somebody up at the door.
> (TT 240:3-8.)

Hearing Officers at the front door who have accomplished knock and notice allows Tatum to enter under California law.

Under federal law, Plaintiffs must be refusing admittance. There is no doubt that Raul Barajas was refusing admittance. His daughter testified that she told her father to let the officers in because Tatum was already inside. (TT 322:9-16.)

Under the circumstances and in accord with the testimony, the "unreasonable act" the jury could have considered was that Tatum didn't "hear" the refusal.

It is important to note that Tatum was part of a three-person team who Elva Barajas testified was professional, polite and, specifically as to Tatum—apologetic.

Similar to Plaintiffs' first request vaguely arguing to ban probation searches, the Court would presumably have to order Rohnert Park Officers to wait for "refusal of admittance" before entering. In other words, carve out a specific exception to the knock and announce statutes in an area where Officers are exposed to the most danger and ask them to wait longer.

**Officer Rodriguez Testimony**:

> So one of the most dangerous parts about entering anybody's residence is the time stuck in front of the front door. And police training we just call that the fatal funnel. It just means you're stuck like in a funnel. So everybody on the inside of the funnel has the advantage on you. You can't see around either side of the doorway. So that's very dangerous. Like, we train not to -- don't stand there very long.
> (TT 196:9-16.)

**(3) Searching every room**

1  Plaintiffs third request appears to ask the Court to ban or restrict Officers from searching
2  every room. Defendants object to Plaintiffs' cherry-picked evidence. According to Officers
3  Rodriquez and Snodgrass, they were not searching every room indiscriminately, they were
4  searching every room for Edgar Perez. The search of a home for a probationer subject to search
5  comes in two forms. The first form is a body size search for the subject of the search based on
6  where he could go and hide. In the time that Plaintiffs and Defendants debated the right to enter,
7  Edgar Perez could have gone anywhere in the home. The Court should recall the undisputed
8  evidence that Edgar Perez' car was outside of the home that day. (TT 187:9-188:9; 262:4-10.)
9  Further, Plaintiffs agree that Edgar Perez lives at the home. (TT 368:8-11; 443:20-23.)

10  Second, Officers may conduct what is called a "protective sweep" of a home during a
11  probation search. "A 'protective sweep' is a quick and limited search of premises, incident to an
12  arrest and conducted to protect the safety of police officers or others. It is narrowly confined to
13  a cursory visual inspection of those places in which a person might be hiding." *Maryland v.*
14  *Buie, 494 U.S. 325* (1990), 494 U.S. 325, 327. A protective sweep is permitted if the searching
15  officer "possesse[d] a reasonable belief based on 'specific and articulable facts which, taken
16  together with the rational inferences from those facts, reasonably warrant[ed]' the officer in
17  believing ... that the area swept harbored an individual posing a danger to the officer or others."
18  *Id*. (citation omitted) (alterations in original). "This 'protective sweep' is not a license to search
19  every nook and cranny of a house, but is subject to two significant limitations: it 'extend[s] only
20  to a cursory inspection of those spaces where a person may be found' and lasts 'no longer than
21  it takes to complete the arrest and depart the premises.'" *United States v. Lemus* (9th Cir. 2009)
22  582 F.3d 958, 962  (quoting *MaryLand*, *supra,* 494 U.S. at 335–36); Also see *United States v.*
23  *Franco* 2018 WL 36887561.

24  According to the testimony of Rodriquez, Officers were looking for Edgar Perez whose
25  car was parked outside. (TT 187:9-188:9; 262:4-10.)   According to Plaintiffs, the officers
26  entered the rooms and looked "very quick".

27  **Elva Barajas Testimony**:
28  Q. Can you describe how long it took for them to search those

areas that you saw?
A. I have no way of knowing the time, and I don't want to say something that's not so.
Q. Would you describe it as real fast?
A. When a person is afraid, the person doesn't know how to calculate times.
Q. Okay. Let me read from your deposition, beginning at page 70.
THE COURT: Starting where?
MR. LEWIS: Page 70, line 13.
THE COURT: Uh-huh.

MR. LEWIS: Through 71, line 10.
THE COURT: Okay. Go ahead.
MR. LEWIS: (Reading)
"Q. Okay. Did you notice that the officers went into your bedroom?
"A. Yes, because I was seated here, and I saw that they went into each room, and they also went into the bathroom (indicating).
"Q. Do you know who went into your bedroom?

"A. No, I don't know.
"Q. Can you describe the person that went into your bedroom?
"A. You know, I couldn't. I wouldn't be able to tell you. It must have been -- I don't know.
"Q. Do you know how much time they spent in your bedroom?
"A. It was real fast. They went in fast and then they went in fast and then they went in fast (indicating), and then they came out real fast.
"Q. So in terms of seconds, it sounds like they went in and came out in maybe a second.
"A. Yes. I never even saw if they even looked in any closets. They went in, they went in, and it was really fast what they did.
"Q. And then they left; correct?

"A. Yes."
(TT 509:4-510:15.)

In other words, Elva Barajas testified that the Officers were conducting a *Buie* search.

Finally, and similar to the preceding requests, it is unclear exactly what the Court is called upon to do. Ban all searches? Indeed, the hypothetical questions presented during the trial do not aid the Court (or anyone) in determining whether the Court should enjoin this practice.

**(4) Detaining all occupants**

12

The fourth request for injunctive relief is equally broad and vague as the previous three requests. Plaintiffs are presenting the facts in such a way that detentions should not be allowed of individuals in similar situations.

As the Court recalls, Defendants knocked on the door, engaged the Plaintiffs and finally Plaintiffs allowed the officers to enter. (TT 108:14-20; 123:3-5; 127:2-8; 191:18-22.) As the officers entered, Plaintiffs simply moved aside. (TT 127:2-8.) These are the facts of the case. No one told them to stay, nor move.

Questions at trial were hypothetical. (See Plaintiffs' Brief p.6:14.) For example, Counsel asks, "would it have been a problem…" or "So you would have instructed…"

An injunction, however, cannot be based on speculation of conduct. It can only be based on conduct, not conjecture.

In addition, this request is not supported by any law because, in accordance with the law, detention of the occupants is automatic during a probation search. In *Sanchez v. Canales* (9th Cir. 2009) 574 F.3d 1169, 1174, the City of Los Angeles was plagued with a number of armed robberies in the Wilshire District. *Sanchez v. Canales* (9th Cir. 2009) 574 F.3d 1169, 1174 [overruled on other grounds]. In response, the department began conducting suspicionless probation compliance checks on probationers with prior arrests for robbery living in the Wilshire area. Oscar Sanchez was one such probationer. The police went to his home after confirming his probation conditions for a suspicionless probation search. It was made more suspicionless by the fact that, unbeknownst to the Department, Oscar was in state prison during the robberies.

Officers went to the Sanchez home at 6:00 am. After knocking and announcing, a member of the Sanchez family opened the door, saw the police and closed it. After a brief demand to open the door or the police would break it down, Sanchez family members opened the door. Police detained the family outside of the home for up to forty-five minutes. The Ninth Circuit discussed the principles behind a detention during a search as (1) preventing flight if incriminating evidence is found, (2) minimizing risk to officers and (3) facilitating the orderly completion of the search. Those principles are equally applicable to probation searches: "it is

constitutionally reasonable to require [the occupant of a home] to remain while officers of the law execute a valid [probation compliance] search." *Michigan v. Summers* (1981) 452 U.S. 692, 705.

The *Sanchez* Court, based on the facts and law above stated, "we hold, pursuant to *Muehler v. Mena*, (2005), 544 U.S. 93, that officers may constitutionally detain the occupants of a home during a parole or probation compliance search. Accordingly—assuming without deciding, as we must, that the officers had probable cause to believe Oscar was at home and the Plaintiffs were detained during the search—we conclude that any such detention was not a violation of the Plaintiffs' clearly established constitutional rights." *Sanchez, supra,* 574 F.3d at 1173.

In the instant case, the trial evidence shows that Edgar claimed he lived at the home (Plaintiffs' Trial Exhibit No. 11), his parents agreed he lived at the home (TT 368:8-11; 443:20-23) and Officers saw his parked car near the home. (TT 187:9-188:9; 262:4-10.)  Thus, there was probable cause he was at the home.

(5) **Performing probation searches when no one is home**

Request Number 5 is amazing in its brevity suggesting that the unsupported request is simply thrown to the Court for raw consumption. It appears to suggest that Rohnert Park Public Safety Officers must knock on a door, and, when no one answers, simply walk away.

The vague nature of such request suggests the Court simply ignore it.

(6) **Ordering a policy**

Plaintiffs' final numbered request seeks injunctive relief from the Court ostensibly asking the Court to order the City to develop a policy on probation searches. Presumably, this means a specific policy as to probation because a search policy already exists. (Defendants' Proposed Trial Exhibit No. 6.)

The problem in responding to Plaintiffs request is, again, that it is overly broad and vague. Plaintiffs complain that "no one is in charge of supervising or coordinating probation searches"; "they have not been provided training on how to do so" (presumably probation

searches); officers do not "consider the litany of factors that officers should consider" in determining whether "a forcible probation search" is reasonable (it is unclear what a "forcible probation" search is). (Plaintiffs' Brief p.7:11.)

Overbroad allegations about "making up rules as they go along" are unsupported by the record including issues of rushing "through a side door." According to Chief Brian Masterson, probation searches are ubiquitous, like auto searches. They happen daily in myriad factual circumstances. (TT 521:25-522:7.) It is not the type of police activity, due to these factors, that lends itself to a ready policy.

Instead, further, according to Masterson and Justice, training for probation searches begins in the police academy proceeds through the field training program and is reinforced in annual training. (TT 521:2-8; 521:17-522:18; 524:2-18; 537:2-12; 542:1-5.) The "custom" of these searches is based on California law. The actual search tactic is a product of training for not only probation searches but also arrest warrant searches and search warrants. Since Plaintiffs offer no guidance on what the probation policy should implement, the Court should refrain from such an order.

(**7) Ordering training (though not numbered)**

Plaintiffs' wrap up request is that the Court order some type of "modest training" to "prevent future constitutional violations". However, Plaintiffs have not presented the Court with supportive testimony on present continuing injury or the likelihood of future injury.

Plaintiffs' cited case is instructive. In *Melendres v. Arpaio* (9th Cir. 2015) 784 F. 3d 1254, the Court discussed the concepts of broad reaching "saturation patrols" which used race as the primary factor in detention decisions. The Court also found evidence that race was a primary factor in "across the board" law enforcement decisions. *Id.*at1260.

There is no such evidentiary showing in this case. Other than the vague hypothetical questions proffered at trial, Plaintiffs have not provided any evidence of ongoing probationer search violations that would be amenable to training.

Finally, this Court must balance the interests of the respective parties. To simply ask the

Court for some type of training to cure some vague and unsupported concern based on the record before the Court fails to acknowledge the interests of the City of Rohnert Park. First, training is not simply showing a video tape and calling it good. The entire City force must be paid for its attendance. Vacancies created by attendance must be back filled usually with overtime. The cost of training is enormous.

Second, "training" must be associated with the training already provided through the academy, through field training and annual training with not only this agency, but the thirteen other agencies with whom Rohnert Park associates during probation searches.

Based on the single event presented to the Court, training is not necessary.

## V.  CONCLUSION

Defendants ask the Court to weigh its injunctive powers strictly. Small municipalities in California do not walk away from judgments without learning from them. There is no need to grant extraordinary relief in this case.

PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ, LLP

Dated: November 29, 2018    By: _____/s/_____
DAVID F. BEACH
SCOTT A. LEWIS
Attorneys for Defendants
CITY OF ROHNERT PARK, JACY TATUM, DAVID RODRIGUEZ, MATTHEW SNODGRASS